# NEW ORLEANS *v.* GAINES'S ADMINISTRATOR.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE EASTERN DISTRICT OF LOUISIANA.

No. 4.   Argued October 13, 14, 1887. — Decided May 13, 1889.

By the French jurisprudence prevailing in Louisiana, a creditor may exercise the rights of action of his debtor, a right analogous to the garnishee or trustee process in some States.

This right cannot be enforced in the Federal courts by an action at law, but by a suit in equity, on the principle of subrogation.

The true owner of lands in Louisiana, having recovered the lands, and obtained judgment for the fruits and revenues against the possessor, may file a bill in equity against the possessor's grantor, who guaranteed the title, to recover the amount thus recovered — the warrantor of title in Louisiana being liable to the grantee for the fruits and revenues, for which the latter has to account to the true owner.

There are degrees of bad faith in the case of unlawful possessors. A merely technical possessor in bad faith, who supposed his title was a good one, and resisted the claims of the true owner in moral good faith, will not be compelled to answer for fruits and revenues which he has not received.

A fictitious charge against such a possessor (by way of fruits and revenues) of a certain per cent per annum on an inflated valuation of the property, exhibited in sales at auction in a time of wild speculation, will be set aside as speculative and unjust.

THIS was a bill filed by Myra Clark Gaines against the city of New Orleans to recover the amount, with interest, of the fruits, revenues and value for use, of certain lands in the city of New Orleans, containing about 135 arpents, which the complainant had recovered from various persons claiming title

under the city. The charge was, that the city was liable as grantor of the land, as well as guarantor of the title, and ought to respond for all the rents and revenues of the property actually received by itself or its grantees, or which might have been received by a judicious and provident use of the property.

The bill was filed August 7, 1879, and on the 5th of May, 1883, a decree was rendered in favor of the complainant for the sum of $1,925,667.83, with interest on $950,110 from January 10th, 1881. From that decree the present appeal was taken.

A brief outline of the history of this litigation will conduce to a better understanding of the case. Daniel Clark, a prominent citizen of New Orleans, of large wealth and possessions, died there on the 16th of August, 1813, without leaving any known heirs-at-law nearer than his mother, who was residing at Germantown, near Philadelphia. A will was found amongst his papers, sealed up in a package bearing the following inscription in his own hand: "This is my olographic will. New Orleans, 20th May, 1811." (Signed) "Daniel Clark." The will was short, containing only the following words, to wit: "In the name of God, I, Daniel Clark, of New Orleans, do make this my last will and testament: *Imprimis.* I order that all my just debts be paid. Second. I leave and bequeath unto my mother, Mary Clark, now of Germantown, in the State of Pennsylvania, all the estate, whether real or personal, which I may die possessed of. Third. I hereby nominate my friends, Richard Relf and Beverly Chew, my executors, with power to settle everything relating to my estate." (Signed) "Daniel Clark." This will was duly admitted to probate, and letters testamentary were granted to the executors named therein.

The executors proceeded to take possession of the estate, and disposed of a large part of it. There were some outlying lands, in the suburbs of the city, bordering on St. John's Bayou, that were not disposed of until 1821, amongst others the lands now in controversy. Relf and Chew, besides being executors of Clark's will, held a power of attorney from Mary Clark, his mother, dated October 1, 1813, by which, styling

herself to be heir, devisee and legatee of Daniel Clark, she appointed them, (Relf and Chew,) naming them as merchants of New Orleans and executors of the will of Daniel Clark, jointly and severally, as her lawful attorneys, for her and in her behalf, to take possession of the real and personal estate of Clark; to manage, sell, let, occupy and sue for the same, or any part thereof; to collect moneys, debts and effects belonging to her as sole legatee, devisee, or heir-at-law of said Clark; to make all necessary and proper acts and deeds for conveying any of the property, and generally to do everything that she could do in the premises. This power was deposited of record with John Lynd, a notary public of New Orleans, on the 22d of April, 1817. By an act of sale, dated 30th of October, 1821, Relf and Chew, in the name of Mary Clark, and by virtue of said power of attorney, after having put up the property at auction, sold and conveyed to one Evariste Blanc, the highest bidder, for the sum of $4760, a piece of land described as situated on the Bayou St. John, containing about 135 superficial arpents, [equal to 114 acres,] adjoining the road of the Navigation, or Carondelet, Canal, the lands of E. Cauchoit, the Broad Street and Bellechasse Street, etc., in conformity with a plan drawn by Joseph Pilié, city surveyor, on the 20th of August, 1821; and they subrogated the purchaser to all the rights of property that Mary Clark had in the land, with right of seizing the same.

On the 26th day of September, 1834, Evariste Blanc sold and conveyed the same and other adjoining lands, amounting in all to 240 arpents, [equal to nearly 203 acres,] to the city of New Orleans for the sum of $45,000, making the cost of the property in question about $25,000. This purchase was made by the city for the purpose of controlling the laying out of the streets and other public improvements, in that district, in conformity with the general plan of the city, and more for the public advantage. No one at that time had any serious question about the validity of the title. Mrs. Gaines, then Mrs. Whitney, it is true, had, with her husband, in June preceding filed a petition in the Probate Court in a pending proceeding on the part of a creditor of Daniel Clark, claiming to be his

daughter and heir, and Relf had been cited to answer it; but it was regarded as a visionary claim, and made no public impression.

The city reserved four or five blocks of this purchase for public purposes, (the erection of drainage works, etc.,) and in March, 1837, sold off most of the balance in building lots. This happened at a time when real estate in New Orleans had suddenly risen to the most inflated and fictitious prices. The real estate craze, indeed, had infected large portions of the country. These sales were afterwards mostly anulled for defects of title, or never carried out, and it would probably have been impossible for the purchasers to have responded for the extravagant prices agreed to be paid. In some cases they were six or seven times the normal value of the property. According to the *procès-verbal* of the auctioneers, the adjudications amounted to the enormous sum of over $600,000, and the sales of the lots and squares involved in the present case amounted to $553,460; but, as before remarked, the whole transaction, except with regard to a few parcels, fell through, and the property came back into the city's hands. Yet the amount of these sales forms the basis of the exceedingly large decree in this case. The same property, afterwards, about 1848, was again put up at auction, and the property now in question brought only about $100,000 including some of the original sales not annulled; — being less than one fifth of the nominal amounts bid at the first sale. This property, afterwards, by a long process of litigation, was recovered by Mrs. Gaines as the heir and devisee of Daniel Clark under a late discovered will, and the tenants were ousted, and this suit was brought, as before stated, to recover from the city the entire rents and revenues of the property from the time of its purchase from Evariste Blanc. The decree in the case, where there was no proof of actual rents and revenues received by the city or its grantees, (as was the case wherever, and as long as, the particular property was unimproved,) charges the city five per cent per annum on the amount of the sales of 1837, from that time to the date of the decree (46 years), and interest on that yearly five per cent from the time it accrued,

making the amount of revenues, in many cases, more than 400 per cent of the said sales. In this way the amount of rents and revenues on unimproved property, with the interest thereon to the 10th of January, 1881, is figured up at $1,348,-959.91; in addition to which the decree awards the complainant the sum of $576,707.92 for the revenues of the improved property whilst in the hands of grantees of the city; making a total decree of $1,925,667.83, with interest to accrue from January 10, 1881, on the sum of $950,110 (the assumed principal) until paid. The master had allowed but 70 per cent of the amount of the sales of 1837 as the basis of calculation, but the court in its final decree deemed it proper to add on the other 30 per cent.

The connection of Mrs. Gaines with this property arose as follows: In the early part of the present century one Samuel B. Davis, generally known as Colonel Davis, resided in New Orleans, and in 1812 removed to Philadelphia, and afterwards to Wilmington, in the State of Delaware. In the war of 1812 he had some command in the defence of the Delaware coast. One of the members of his family was a young girl, named Myra, who passed as his daughter; but some of Daniel Clark's intimate friends, including Colonel Davis, were aware that the girl was acknowledged by Clark to be his daughter, — natural daughter, as generally supposed. She had been born in New Orleans in 1805 or 1806, and placed in Davis's family, who was an intimate friend of Clark. Her mother was née Zulime Carrière, but at the time of the child's birth was called Madame Des Grange, having been married to a man of that name. In 1802 she had had a previous child by Clark, named Caroline, who was born in Philadelphia, and educated there and in Trenton, at Clark's expense, his partner and agent in Philadelphia, Mr. Daniel W. Coxe, having charge of her. This daughter afterwards married a man by the name of Barnes. After the birth of her first daughter, Zulime or Madame Des Grange returned to New Orleans, and Myra was born there. This child was taken into the family of Colonel Davis, as before stated, and passed as his daughter. On the 13th of September, 1832, she was married to Mr. William

Wallace Whitney at Delamore Place, State of Delaware (Colonel Davis's residence), as the daughter of Colonel Davis.[1] Mr. Whitney having died in 1837, she afterwards, in 1839, married General Edmund P. Gaines. She always asserted that, up to the time of her marriage to Whitney, she was wholly ignorant of her true paternity.

Her claim to be entitled to the property of Daniel Clark rests on two grounds: first, that she was his legitimate daughter; second, that he made a will shortly before his death in 1813 (which, however, was lost or destroyed), in which he declared her to be his legitimate daughter, and bequeathed to her all his estate subject to the payment of certain legacies.

The first claim, that she was the legitimate daughter of Daniel Clark, was based on the allegation that he was married to her mother, Zulime Carrière, or Madame Des Grange, at Philadelphia in 1802 or 1803. This supposed marriage is testified to by Zulime's sister, Madame Despau, who says that Mr. Clark desired it to be kept secret, because Zulime's husband, Des Grange, was still living. This was true; but against that it is alleged that he (Des Grange) had another wife living when he married Zulime, so that his marriage with her was void. Proceedings were undertaken in the ecclesiastical court, at New Orleans, in September, 1802, to convict Des Grange of bigamy, but they failed, and he was discharged. The validity of Zulime's marriage to Clark, therefore, in the last of 1802, or beginning of 1803, (if they were married,) depended on the fact of Des Grange being a married man when he married Zulime, which was in 1794. On this point considerable evidence of a conflicting character was taken.

Meantime Daniel Clark, in 1806 or 1807, paid his addresses to a Miss Caton, of Baltimore, and in August, 1808, Zulime married a Dr. Gardette, of Philadelphia — proceedings, both, which seemed to many persons inconsistent with the marriage of Clark and Zulime in 1803. Her sister's explanation, how-

---

[1] *Marriage notice in the Philadelphia Gazette of September* 17, 1832 : " Married.— On Thursday evening, the 13th inst., at Delamore Place, Del., by the Rev. Mr. Pardee, William Wallace Whitney, Esq., of New York, to Miss Myra E., daughter of Colonel Samuel B. Davis."

ever, was that Zulime was indignant that Clark delayed to acknowledge her and that he paid his addresses to another lady.

This is the general result of the allegation of Zulime's marriage with Daniel Clark. It is clear from the evidence of some of his confidential business friends that they gave it no credence. But a majority of this court, in *Gaines* v. *Hennen*, 24 How., and *Gaines* v. *New Orleans*, 6 Wall., were satisfied from the evidence that they were married in 1802 or 1803, and that Zulime was free to marry at the time. Of course we are bound by that decision in this case, as the city of New Orleans was a party or privy in those cases.

The other ground on which Mrs. Gaines's claim rests, is the supposed will which Daniel Clark made shortly before his death, in 1813. No copy of such will was ever found; but the testimony of certain persons intimate with Clark was adduced, to the effect that they saw such a will in his hands, and knew it to be in his handwriting, and either read it or heard him state the contents of it; and heard him declare that he intended it to be his last will; and from this testimony the will on which the whole claim of Mrs. Gaines really turns was reduced to writing and admitted to probate in the state courts of Louisiana, and the courts of the United States considered themselves bound by that decision. It is true that the Louisiana courts have since decided against the will, and revoked the probate; but their decision has been set aside by this court because Mrs. Gaines had applied to have the cause removed to the United States Circuit Court, and the court of the State had refused to allow such removal. The case was afterwards tried by the Circuit Court of the United States, and that court made a decree confirming the probate of the will. This decree was made on the 30th of April, 1877, at the same time with decrees in two other cases against various possessors of the property in question, which will be noted hereafter.

All this was the outcome of a long series of litigation on the subject of Mrs. Gaines's claim. Her first appearance in the courts, and the first notice that any one had of her claim, was her filing a petition with her husband, W. W. Whitney, as

before stated, on the 18th of June, 1834, (21 years after Clark's death,) in the Probate Court of New Orleans, in a certain proceeding instituted by one Shaumburg, a creditor of Clark, against his executors for not executing the will and settling up the estate. In this petition she claimed to be the child and only heir of Daniel Clark, and prayed that the will of 1811 might be annulled and set aside, and that she might be declared the heir of Clark, and that the executors of the will of 1811 might be decreed to deliver up to her the possession of all the property belonging to the estate. She alleged that Clark had made another will making her his sole heir; but made no application concerning it. After some litigation the plaintiff, Shaumburg, was non-suited in June, 1836, and that proceeding was ended.

In July of the same year (1836) Myra and her husband, Whitney, filed a bill in the Circuit Court of the United States for Louisiana against Relf and Chew, the executors of the will of 1811, and against the heirs of Mary Clark (Daniel's mother — who had died in 1823) and against the occupants of the various tracts of land of which Clark died seized, amongst others, against the city of New Orleans as occupant of the Blanc tract of 135 arpents; and praying for the establishment of the will of 1813, which she alleged had been made and left by Mr. Clark and had been destroyed; and that it might be decreed that the will of 1811 was revoked by the will of 1813 and was void; and that it might be further decreed that she, Myra, was the legitimate child of said Clark, and that he, Clark, was the lawful husband of her mother, Zulime Carrière; and that all the sales of real and personal property and slaves of said Clark made by Relf and Chew were null and void; and that the occupants and possessors of the real estate and slaves should deliver up the same to the complainant with all the rents, profits and issues thereof, and for an accounting, etc. This suit was pending in the Circuit Court and in this court until 1852. Different phases of it will be found reported in 13 Pet. 404; 15 Pet. 9; 2 How. 619; 6 How. 550.

The Circuit Court in the case of *Gaines* v. *Chew,* 2 How. 619, was divided in opinion on three points : (1) whether the

bill was multifarious or not; (2) whether the court had juris-diction of the case without probate of the will of 1813; (3) whether the case was one of equity or law. This court held, (1) that the bill was not multifarious, being against the execu-tors Relf and Chew, and those who claimed under them; (2) that no claim could be based on the will of 1813 until it was admitted to probate, and the probate of the first will was revoked, and that the Circuit Court had no jurisdiction for this purpose; (3) that the discovery sought by the bill was sufficient to give the court of chancery jurisdiction. This decision was rendered in 1844. Meantime Mr. Whitney had died in 1837, and Myra was married to General Edmund P. Gaines in 1839, who died in June, 1849; the suit being revived as occasion required.

Proceedings were carried on separately against one of the defendants, named Patterson, in the Circuit Court, and a decree was obtained there in 1840 in favor of the complainants, requiring Patterson to surrender the property claimed by him. On appeal to this court the decree was reversed, and a decree was made establishing, as against Patterson, the validity of Clark's marriage with Zulime Carrière, the legitimacy and heirship of Myra, and her title as forced heir to four fifths of the property held by Patterson, notwithstanding the will of 1811. The other defendants have always insisted that this case was a collusive one. The decree of this court was rendered early in 1852, and the case is reported as *Patterson* v. *Gaines*, 6 How. 550.

Thus far, 39 years after Clark's death, only one piece of property had been recovered; but declarations of the majority of this court were made that gave the complainants great encouragement to continue the litigation.

As none of the parties, except Patterson, were bound by the decision against him on the legitimacy question, and as it was a question attended with some difficulties, it was deemed important by Mrs. Gaines, and her counsel, if possible, to have the will of 1813 established by probate proceedings in Louisi-ana. The next move was in that direction. In January, 1855, a petition for that purpose was filed by her in the

proper Probate Court in New Orleans. In March following judgment was rendered against the will, and denying probate. But in December, 1855, a decision was rendered by the Supreme Court of Louisiana, on appeal, establishing the will in the form contended for by Mrs. Gaines, and a decree was entered to that effect on the 25th of February, 1856. This was more than 42 years after the death of Mr. Clark.

The decree of probate thus obtained was of limited effect. It bound none but those who were parties to the proceeding. The city of New Orleans and Relf, surviving executor of the will of 1811, applied for leave to intervene in the case; but leave was refused. An attorney was appointed to represent the absent relatives. But the probate of the will enabled Mrs. Gaines to take her stand upon it in the courts of the United States, and to avail herself, until it was successfully assailed, of the status which it gave her, by express declaration, as the legitimate child and sole heir and legatee of Daniel Clark.

Immediately after probate of the will was thus obtained, new litigation was started against the parties in possession of the property of Daniel Clark, all the suits being bills in equity. First, a bill was filed by Mrs. Gaines against François Dusnan de la Croix to recover the slaves left by Clark, which were purchased by de la Croix from the executors. Next, a bill was filed December 22, 1856, by Mrs. Gaines against the city of New Orleans and four other persons, charging the city as possessed of the whole 240 arpents before mentioned, being the entire tract sold to the city by Evariste Blanc, including the 135 arpents now in question. Lastly, a bill was filed March 27th, 1857, against Lizardi, Egaña, Slidell, Hennen and 14 others, as possessors respectively of the several lots contained in a square between Poydras and Perdido streets in New Orleans, but not embracing any of the Blanc tract.

The bills in these three cases were dismissed by the Circuit Court by simultaneous decrees rendered by Judge McCaleb, on the 17th of April, 1858. These decrees were appealed to this court, and were severally reversed, and the claim of Mrs. Gaines was sustained by a majority of the court.

In the last case, that of *Gaines* v. *Lizardi and others*, de-

cided in January, 1861, and reported in 24 How. 553, under the name of *Gaines* v. *Hennen*, Chief Justice Taney and Justices Catron and Grier dissented. In the other two cases, *Gaines* v. *New Orleans* and *Gaines* v. *De la Croix*, decided in January, 1868, and reported in 6 Wall. 642, 719, Justices Grier, Swayne and Miller dissented. In consequence of the absence of a justice of the Supreme Court at the Circuit Court holden at New Orleans, and the district judge being interested, the judgments were not entered there on the mandates until May, 1871.

The lands recovered were generally surrendered, and where no settlements were made references were ordered to ascertain and take account of the rents and revenues — but only five squares of the Blanc tract were recovered, being all that remained in the possession of the city. The Circuit Court, following the declarations of the Supreme Court, held that the defendants were possessors in bad faith — that is, that they were chargeable with notice of Relf and Chew's want of authority to sell the lands in question, and that this deprived them, under the law of Louisiana, of the benefit of prescription, and made them accountable for all the rents and revenues from the time their respective possessions commenced. This operated as a great hardship; for, although technically possessors in bad faith, the defendants really and in truth supposed their titles to be valid. The Circuit Court also decided, in the case against the city, that the latter was not responsible for rents and revenues except whilst in actual possession of the property; and as the city had sold off the greatest portion of the Blanc tract, and had only retained possession of the square on which the drainage machine was located and four other vacant squares, a reference was ordered to ascertain the amount of rents and revenues derived from those portions and from the residue of the whole tract whilst it remained in the city's hands. The master estimated the rents and revenues derived from the drainage machine in several different ways, resulting in different amounts, the lowest being $2400 a year for the preceding 35 years, which, with interest and after deducting expense of repairs, amounted to $125,266.79. He

further reported that no rents or revenues were derived from the four vacant squares or from the residue of the property whilst in the city's possession. A decree was rendered for the amount reported, and was afterwards affirmed by this court in the case of *New Orleans* v. *Gaines*, 15 Wall. 624. The principle established in that case, that the city was not responsible for rents and revenues except during the time of its actual possession, will have a bearing on one of the branches of the present case hereafter considered.

After the settlement of Mrs. Gaines's general claim in her favor in the cases of *Gaines* v. *Hennen*, *Gaines* v. *New Orleans*, and *Gaines* v. *De la Croix*, she commenced other suits against the actual possessors of the property of Daniel Clark. On the 22d of November, 1865, she filed a bill against P. H. Monsseaux and over 190 other persons alleged to be in possession of various lots that belonged to said Clark, including portions of the Blanc tract sold to the city as aforesaid. On the 12th of February, 1870, she filed another bill against P. F. Agnelly and over 300 other persons alleged to be in possession of other lots belonging to said Clark, including other portions of the Blanc tract. On the 30th of April, 1877, decrees were entered in these suits in accordance with the previous decisions, and references were made to a master to ascertain the amount of rents and revenues due from the various parties. In the former case rents and revenues were reported to be due from 103 different parties occupying lots on the Daniel Clark portion of the Blanc tract, amounting in the aggregate to $471,836.54; in the latter case rents and revenues were reported due from 38 different parties occupying lots on said tract, amounting in the aggregate to $45,212.80. The total of both was $517,049.34. These sums included interest to the time of the accounting in each case, at different dates in the years 1877, 1878 and 1879. The property was generally improved property, and the parties were charged for the time they occupied it the full amount of rents and revenues received or that might have been received. These amounts with interest, continued to January 10, 1881, were included, without alteration, in the decree in the present case. They were regarded as in the nature of *res judicata*.

There was another suit determined by the Circuit Court at the same time with those just referred to. This was the case of Joseph Fuentes and 74 other persons, including the *City of New Orleans* v. *Mrs. Gaines,* instituted May 27, 1869, in the Probate Court of New Orleans, to revoke the will of 1813, and to recall the probate thereof. Mrs. Gaines applied to remove the case to the Circuit Court of the United States, but the state court, as before stated, refused to relinquish jurisdiction, and on the 4th of December, 1871, rendered a decree revoking the probate of that will. This decree was affirmed in February, 1873, in a very elaborate opinion by the Supreme Court of Louisiana; but the decree of that court was reversed by this court in March, 1876, on the ground that the case should have been removed. *Gaines* v. *Fuentes,* 92 U. S. 10. The Circuit Court afterwards, on the 30th of April, 1877, rendered a decree to the effect that the will was duly probated by the Louisiana court, in 1855, and upon sufficient legal and truthful testimony.

Finally, the present suit was commenced by a bill filed August 7th, 1879, as before stated, for the purpose of compelling the city of New Orleans to respond for all the rents, fruits, revenues and profits of the whole 135 arpents of Clark's land purchased of Evariste Blanc in 1834, from the time of such purchase until the time of bringing the suit, except those which had been accounted for in the suit of *Gaines* v. *City of New Orleans,* before referred to.

*Mr. Henry C. Miller* and *Mr. J. R. Beckwith* for appellant.

I. There is no equity jurisdiction to compel a unilateral account when there are no offsets or items to be charged, discharged or surcharged, nor to compute damages for alleged torts. *Hipp* v. *Babin,* 19 How. 271; *Root* v. *Railway Co.,* 105 U. S. 189; *Ellis* v. *Davis,* 109 U. S. 485; *Gaines* v. *Miller,* 111 U. S. 395; *Van Weel* v. *Wooston,* 115 U. S. 228; *Buzard* v. *Houston,* 119 U. S. 347; *Parkersburg* v. *Brown,* 106 U. S. 487; *Ambler* v. *Choteau,* 107 U. S. 586; *Litchfield* v. *Ballou,* 114 U. S. 190. In such case the defendant has a con-

stitutional right to a trial by jury. *Insurance Co.* v. *Bailey*, 13 Wall. 616; *Grand Chute* v. *Winegar*, 15 Wall. 355; *Lewis* v. *Cocks*, 23 Wall. 466; *Killian* v. *Ebbinghaus*, 110 U. S. 568; *New York Guarantee Co.* v. *Memphis Water Co.*, 107 U. S. 205; *Francis* v. *Flinn*, 118 U. S. 385; *United States* v. *Wilson*, 118 U. S. 86; *Fussell* v. *Gregg*, 113 U. S. 550.

. II. Equity will not deal with an account simply because it is complicated; to sustain a bill for an account there must be mutual demands: not a single matter involved, but a series of transactions on the one side, and payments on the other. *Porter* v. *Spencer*, 2 Johns. Ch. 179; *Badger* v. *McNamara*, 123 Mass. 117; *Walker* v. *Brooks*, 125 Mass. 241; *Ball* v. *Carew*, 13 Pick. 28; *Dinwiddie* v. *Bailey*, 6 Ves. 136; *Bailey* v. *Taylor*, 1 Russ. & Myln. 73; *Ambrose* v. *Dunmow*, 9 Beavan, 508; *Padwick* v. *Stanley*, 9 Hare, 627; *Hemings* v. *Pugh*, 4 Giff. 456. A bill will not lie for a mere money demand, which can be perfectly well ascertained at law. *Holmes* v. *Eastern Counties Railway*, 3 Kay & Johns. 675; *Darthez* v. *Clemens*, 6 Beavan, 165; *O'Mahony* v. *Dickson*, 2 Sch. & Lef. 400. Complication of accounts, where the receipts or items are all on one side, if ever sufficient ground for intervention of equity, must show a very strong case of entanglement. *Foley* v. *Hill*, 1 Phillips Ch. 399.

III. Where there is an effort to give equity jurisdiction by a general charge that accounts were intricate, and cannot be taken without the aid of equity, the bill must disclose circumstances and facts showing the intricacy of the account, or the bill will be dismissed. *Bowles* v. *Orr*, 1 Younge & Coll. 464; *Padwick* v. *Hurst*, 418 Beavan, 575; *Norris* v. *Day*, 4 Younge & Coll. Ex. Eq. 475; *Jones* v. *Manud*, 3 Younge & Coll. Ex. Eq. 347; *Phillips* v. *Phillips*, 9 Hare, 471; *Glenie* v. *Imri*, 3 Younge & Coll. Ex. Eq. 432; *Fluker* v. *Taylor*, 3 Drewry, 183; *Ranger* v. *Great Western Railway Co.*, 5 H. L. Cas. 72.

IV. A bill in equity cannot be maintained for discovery if it cannot be maintained for relief, unless the bill shows the discovery to be in aid of a suit at law or the defence of a suit at law, actually pending or about to be brought and the action

or defence not frivolous. *Brown* v. *Swan*, 10 Pet. 497; (in this case the doctrine is elaborately considered;) *Mitchell* v. *Green*, 10 Met. 101; *Pool* v. *Lloyd*, 5 Met. 525; *Ahrend* v. *Odiorne*, 118 Mass. 261; *Walker* v. *Brooks*, 125 Mass. 241; *Haskins* v. *Burr*, 106 Mass. 48; *Dun* v. *Coates*, 1 Atk. 287; *Anon.* 2 Ves. Sen. 451; *Gelston* v. *Hoyt*, 1 Johns. Ch. 547, 548. It is doubtful if a bill of discovery can be maintained since parties can be examined as witnesses. *Heath* v. *Erie Railway Co.*, 9 Blatchford, 316.

V. A bill against a corporation as sole defendant, or a bill that waives answer under oath, is not a bill for discovery. *Huntington* v. *Saunders*, 120 U. S. 78; *United States* v. *Wagner*, L. R. 2 Ch. 582; *Republic of Liberia* v. *Roye*, 1 App. Cas. 139; *Republic of Costa Rica* v. *Erlinger*, L. R. 19 Ex. 33; *Republic of Peru* v. *Wegelns*, L. R. 20 Eq. 140.

VI. *Res Judicata* bears upon parties and all those in privity, and is not only conclusive as to all matters that have been drawn into the controversy between them in a former judicial controversy, but also conclusive as to all matters that might have been litigated in the prior litigation. *Packet Co.* v. *Sickles*, 6 Wall. 592; *Hopkins* v. *Lee*, 6 Wheat. 109; *United States Bank* v. *Beverly*, 1 How. 134; *Chapman* v. *Smith*, 16 How. 114; *Thompson* v. *Roberts*, 24 How. 233; *Campbell* v. *Rankin*, 99 U. S. 261; *Baird* v. *United States*, 96 U. S. 430; *Aurora* v. *West*, 7 Wall. 82; *The Appollon*, 9 Wheat. 362; *Durant* v. *Essex Co.*, 7 Wall. 107; *Nashville &c. Railway* v. *United States*, 113 U. S. 261; *Hebburn* v. *Dunlop*, 1 Wheat. 179; *Ballance* v. *Forsyth*, 24 How. 183; *Beloit* v. *Morgan*, 7 Wall. 619; *Gould* v. *Evansville &c. Railroad Co.*, 91 U. S. 526; *Whiteside* v. *Haselton*, 110 U. S. 296; *Corcoran* v. *Ches. & Ohio Canal Co.*, 94 U. S. 741; *Bryan* v. *Kennett*, 113 U. S. 179; *United States* v. *Parker*, 120 U. S. 89; *Coffey* v. *United States*, 116 U. S. 436. This is also the established jurisprudence in all of the States.

VII. Under the statute law of Louisiana, a plaintiff cannot split up a cause of action and sue in detail or detachments. Articles 91 and 156 of the Louisiana Code of Practice have been in continuous force since 1825, long before Mrs. Gaines

commenced any litigation as heir of Clark. Article 91 relates to the jurisdiction of the court as to amount, and ends in its last paragraph: " But if one in order to give jurisdiction to a judge, demand a sum below that which is really due him, he shall be presumed to have remitted the overplus, and after having obtained judgment for the sum he had claimed, he shall lose all right of action for that overplus." It may be claimed that this article is special and applies only to cases where the plaintiff has abated his demand in order to give jurisdiction to a particular court. If this is true, still Article 156 is conclusive. That article is as follows: " If one demand less than is due him, and do not amend his petition in order to augment his demand, he shall lose the overplus." Both of these articles have received judicial construction by the Supreme Court of the State. *McCaleb* v. *Estate of Fluker*, 14 La. Ann. 316; *Brandagee* v. *Chamberlain*, 2 Rob. La. 207; *Vascocu's Widow* v. *Pavie*, 14 La. 135. It will not be disputed that this is a firmly established part of the law of remedy in Louisiana, and has been in full force and operation since 1825.

The rule as stated in Article 156 is exactly the rule that has always prevailed both in equity and common law courts. *Rockwell* v. *Langley*, 19 Penn. St. 502; *Smith* v. *Weeks*, 26 Barb. 463; *Fulton* v. *Matthews*, 15 Johns. 432; *S. C.* 8 Am. Dec. 261; *Weckersham* v. *Whedon*, 33 Missouri, 561; *Stein* v. *Steamboat*, 17 Ohio St. 471; *S. C.* 93 Am. Dec. 631; *Barksdale* v. *Greene*, 29 Georgia, 418; *Rogers* v. *Higgins*, 57 Illinois, 244.

VIII. " The sale of a thing belonging to another person is null. It may give rise to an action for damages in case of eviction when the buyer knew not that the thing belonged to another person." This rule, as construed in Louisiana, refuses damages in case of eviction where the buyer knew the thing did not belong to the vendor: *Jeannin* v. *Milluadon*, 5 Rob. La. 76; *Hall* v. *Nevill*, 3 La. Ann. 326; *Scott* v. *Featherston*, 5 La. Ann. 306; *Nash* v. *Johnston*, 9 Rob. La. 8.

IX. Daniel Clark's will of 1811, after its probate, was a muniment of title warranting possession by the occupants of the Blanc tract until it was set aside by the probate of the

alleged will of 1813. *Davis* v. *Gaines*, 104 U. S. 386; *Allen* v. *Dundas*, 3 T. R. 125; *Rex* v. *Vincent*, 1 Strange, 481; *Woolley* v. *Clark*, 5 B. & Ald. 744; *Packman's Case*, 6 Rep. 19; *Simene* v. *Simene*, 1 Lev. 3d. ed. 90; *Thomson* v. *Harding*, 2 El. & Bl. 630; *Parker* v. *Kett*, 1 Ld. Raym. 658; *Waters* v. *Stickney*, 12 Allen, 1; *S. C.* 90 Am. Dec. 122; *Kittridge* v. *Folsom*, 8 N. H. 98; *Stone* v. *Peasley's Estate*, 28 Vermont,. 716; *Steele* v. *Renn*, 50 Texas, 467.

X. A warrantor, who is not in possession, in the event of recovery on the covenant of warranty, only owes interest from judicial demand if the amount is liquidated, or from judgment if the amount is unliquidated. *Melançon's Heirs* v. *Robichaud's Heirs*, 19 La. 357; *Daquin* v. *Coiron*, 3 La. 387; *Connolly* v. *Bertrand*, 12 La. 313; *Herman* v. *Sprigg*, 3 Martin (N. S.) 190.

XI. The warrantee has no right of action against the warrantor until the warrantee is actually out of possession. The return of a writ of possession to which the warrantor is not a party is not adequate proof of actual eviction in a suit on the covenant of warranty. *Hale* v. *New Orleans*, 13 La. Ann. 499; *Melançon's Heirs* v. *Duhamel*, 7 La. 286; *Fletcher's Heirs* v. *Carélier*, 10 La. 120; *Laborde* v. *New Orleans*, 13 La. Ann. 326.

XII. The owner of realty, after eviction of adverse holder, has no action against the vendor of the evicted for rents and profits. *Gillaspie* v. *Citizen's Bank*, 35 La. Ann. 779.

*Mr. John A. Campbell, Mr. Thomas J. Semmes* and *Mr. Alfred Goldthwaite* for appellees.

Mr. Justice Bradley, after stating the case as above reported, delivered the opinion of the court.

The complainant's claim in this suit is that the city of New Orleans, as unlawful possessor and vendor of the property, is primarily responsible in the same manner and to the same extent as it would have been if it had never sold any part of it, but had remained in possession of the whole from the time of

its purchase to the present time. The argument is, that the city, as vendor, put its grantees into possession, and thus enabled them to keep the complainant out of possession, and is, therefore, responsible as principal, and not merely as surety or guarantor of its grantees; — although the latter position is also assumed. Its liability as principal is asserted as a fundamental proposition on which the case may be safely rested.

Another principle invoked and applied is, that, inasmuch as the city of New Orleans claimed the property under the sale of Relf and Chew, although claiming it through the medium of Evariste Blanc, it was a possessor in bad faith, and, as such, accountable, not only for the rents and revenues actually received, but for all that might have been received by the most provident management of the property.

The manner in which these assumed principles of law have been applied by the court below in the disposition of the case will be considered hereafter.

As already stated, the amount of the decree pronounced against the city was $1,925,667.83, of which $1,348,959.91 were for rents and revenues of unimproved property. The remainder, $576,707.92, was for rents and revenues of improved and unimproved property found due from the defendants in the suits of *Gaines* v. *Monsseaux et al.* and *Gaines* v. *Agnelly et al.*, before referred to; the amount being somewhat increased by additional interest. The parties in those cases relied on the city to protect them, and appear to have let things take pretty much their own course.

As the complainant was allowed, in her first suit against the city of New Orleans, before referred to, to recover all rents and revenues received by the city from each portion of the Blanc tract, derived from Clark's estate whilst it was in possession thereof, the complainant, in her claim before the master in the present case, waived all rents and revenues arising from the tract prior to March 10, 1837, the time when the auction sale was made as before mentioned; but claimed that there had been no adjudication or recovery against the city for any such rents and revenues after that date, except for the five squares referred to in that former suit; and hence she

claimed an account for all rents and revenues accruing after the 10th of March, 1837, except with regard to the said five squares, and some few other lots specially designated, which do not require attention here.

The master, therefore, in taking his account, assumed that no account of rents and revenues had ever been rendered by the city after the said 10th day of March, 1837, except as aforesaid, and proceeded to charge it with the entire rents and revenues of all the land in the whole tract, (except as aforesaid,) from the said date to the time of making the report, without regard to the question whether the city or its grantees were in actual possession or not. The rents and revenues thus charged against the city for unimproved land were not rents and revenues actually received, but fictitious rents and revenues, assessed at the rate of five per cent per annum on 70 per cent of the amount of the inflated sales of 1837, with interest thereon to the time of making the report, that being what the master deemed a fair equivalent of what the property ought to have produced. We shall see hereafter that the court added to this estimate interest on the other 30 per cent of the amount of said sales.

From the reports of the master we are led to understand that the amounts found due from the defendants in the other suits, aggregating, with interest, $576,707.92, as above stated, were estimated and made up on the same principles which were followed with regard to the unimproved property; not by taking merely the actual rents and revenues received, but adding thereto fictitious amounts which it was supposed might have been received by provident management, and by interest on hypothetical values in the absence of other evidence of income.

Now, in relation to the principles before referred to, on which the complainant contends that her case may be rested, and which the court seems to have adopted, we have the following observations to make. The first proposition is that the city of New Orleans is primarily liable for all the rents and revenues of the entire tract derived from the Clark estate and purchased from Evariste Blanc, for the entire period since

1837, down to the time of the decree. Leaving out of view, for the present, the secondary liability to which the city may be equitably bound to respond on its warranty of title to its grantees, is it true, in point of law, that the city is primarily liable in the manner above stated, with regard both to the time when it had possession itself, and also to the time when its grantees had the possession? The contrary of this proposition was distinctly decided by the Circuit Court in the case of *Gaines* v. *New Orleans*, and its decision was affirmed by this court in *New Orleans* v. *Gaines*, 15 Wall. 624. It is true that the complainant acquiesced in the decision of the Circuit Court in that case, and did not appeal; but that only left the decision standing as a precedent against her, all the more effective for such acquiescence.

The common law, certainly, does not recognize any such rule as that contended for. The person who receives the rents and profits is the only person who is to respond for them. It was even made a question in *Doe* v. *Harlow*, 12 Ad. & El. 40, and in *Doe* v. *Challis*, 17 Q. B. 166, whether the landlord of a tenant in possession was liable for mesne profits. After argument it was decided that he was. But the reason of this is obvious: the tenant's possession is the possession of his landlord. It is true that, by the ancient law, where there was an entire disseisin, the estate was deemed out of the disseisee for the time being, and no intrusion upon the land was a trespass against him; and, therefore, a grantee of the disseisor, or a second disseisor, was not responsible to the true owner at all, who had to look to his immediate disseisor for damages in an assize. Hobart, 98. But the modern action for mesne profits only lies against the tenant in possession who is cast in an action of ejectment; and where no ejectment has been brought, the actual trespasser on the land is the person amenable to an action of trespass *quare clausum fregit*, or assumpsit for use and occupation, where the trespass is waived.

The present case, however, is not to be decided by the rules of the common law. The counsel for the complainant relies on the French or civil law to sustain his position. But no case is cited to show that the rule contended for has ever been

adopted in Louisiana. On the contrary, there is a very recent case which decides the contrary. We refer to *Gillaspie* .v. *Citizen's Bank*, 35 La. Ann. 779. In that case the bank had foreclosed a mortgage and bought in the property, and after three or four years' possession sold it to a third person. More than a year after this sale, a suit was brought by a guardian of minor children interested in the land, for a nullity of the sale on foreclosure, and judgment of nullity was rendered and the sale was set aside, on the ground that in the executory process of the bank two of the joint owners of the property had not been made parties. A suit was then brought against the bank to recover the minors' share of the fruits and rents from the time of the sale under the foreclosure, including the time that the grantee, or vendee, of the bank had possession, as well as that in which the bank itself had possession. The Supreme Court of Louisiana held that this could not be done; that it was a familiar rule of their jurisprudence, that "the possessor alone can be held liable to account for rents and revenues"; and, therefore, that the right of the plaintiff to demand rents and revenues against the bank must be restricted to the time it was in possession. This case is conclusive against the complainants' contention as to the primary liability of the city, except for the actual time when the city was in possession.

The only plausible ground on which the city can be made responsible for rents and revenues received by its grantees is that of subrogation, by which the real owner whose title has been judicially established, after pursuing the grantee in possession, and reducing his or her demand against such possessor into judgment, may take the place of such grantee and possessor in suing the grantor, who is under obligation to protect and indemnify such grantee. Can this be done in the present case? The grantees have been sued; judgment has been obtained against them; the city was sufficiently notified of the prosecution to be bound by the result as guarantor; indeed, the city practically conducted the defences. The complainant in her bill alleges, and it is proved, that the defendants in those suits have demanded of the city that it pay or settle the said

judgments and protect them therefrom. The complainant also alleges in her bill that the said defendants are unable to pay the said judgments, except through the aid of the city.

Under these circumstances, the grantees who have lost their property, and who have thus been made liable in judgments for the rents and revenues, might themselves, before satisfying such judgments, have maintained a suit in equity against their guarantor, the city of New Orleans, to protect them from the adjudged liability to pay. An action at law would not lie until actual payment; but equity would regard it the duty of the guarantor to protect the grantee from the extreme hardship of having to pay that which the guarantor himself ought to pay, it being the law of Louisiana that a person evicted from property conveyed to him with warranty may recover from his warrantor not only the price, but the amount of rents and revenues, which he is bound to respond for to the true owner.

As between the city and its grantee, the former, by reason of its guaranty of title, is really the principal debtor, and bound to protect the grantee as a principal is bound to protect his surety. Therefore the grantee is entitled to such remedies as a surety hath; and when fixed by judgment, if not before, may file a bill against his guarantor to protect him. Lord Redesdale says: "A court of equity will also prevent injury in some cases by interposing before any actual injury has been suffered, by a bill which has been sometimes called a bill *quia timet*, in analogy to proceedings at the common law, where in some cases a writ may be maintained before any molestation, distress, or impleading. Thus a surety may file a bill to compel the debtor on a bond in which he has joined to pay the debt when due, whether the surety has been actually sued for it or not; and upon a covenant to save harmless, a bill may be filed to relieve the covenantee under similar circumstances." Redesdale's Treatise, 148, 4th ed.; and see *Ranelaugh* v. *Hayes*, 1 Vernon, 189, 190; *Lee* v. *Rook*, Mosely, 318; *Wooldridge* v. *Norris*, L. R. 6 Eq. 410; *Marsh* v. *Pike*, 10 Paige, 595, 597; *Taylor* v. *Heriot*, 4 Desaussure, 227; Fell on Guaranties, 247; De Colyar on Guaranties, 308, c. 5, Amer. ed. In *Lee* v. *Rook*, the Master of the Rolls said: "If I borrow money on a

mortgage of my estate for another, I may come into equity (as every surety may against his principal) to have my estate disencumbered by him."

Then, if the grantees, who have been ousted, and who are condemned in judgment to pay to Mrs. Gaines the rents and revenues due to her, might have maintained a suit in equity against the city to compel it to indemnify them, why may not Mrs. Gaines be subrogated to the grantees' right and equally maintain a suit against the city? The claim is an equitable one. It is in proof that all the acts of sale of the city contained express agreements of guaranty, with right of subrogation; and an act of sale in Louisiana imports a guaranty whether it is expressed or not.

But if the suit could not be maintained on purely equitable grounds alone, there is a principle of the civil law obtaining in Louisiana, by the aid of which there can be no doubt of its being maintainable. The Code Napoléon had an article (Art. 1166) expressly declaring that creditors may exercise all the rights and actions of their debtor, with the exception of those that are exclusively attached to the person. It is true that the Louisiana Code has no such article; but it is laid down by writers of authority that this principle prevails in French jurisprudence without the aid of any positive law. 43 Dalloz, 239, etc., title *Vente,* Arts. 932–935. The decisions to the contrary seem to be greatly outweighed by other decisions and by sound doctrine. The right thus claimed for the creditor (the word creditor being used in its large sense, as in the civil law) may very properly be pursued in a suit in equity, since it could not be pursued in an action at law in the courts of the United States; and all existing rights in any State of the Union ought to be suable in some form in those courts.

We think, therefore, that this part of the decree, amounting to the sum of $576,707.92, with accruing interest, being for the amount of the judgments obtained in the other suits, ought to be allowed, unless subject to reduction for the cause hereafter referred to.

As to the remainder of the decree, amounting to $1,348,-959.91, being for rents and revenues and "value for use,"

as the master calls it, of the unimproved land, we cannot concur in the decision of the Circuit Court. We think that that sum is made up and arrived at by a method entirely too unsafe and unreliable. It being conceded that the city or its grantees actually derived no rents or revenues at all from the property, the former is charged, instead, with interest, in many cases, for more than forty years, on a false and inflated valuation, based on the sales of 1837 which were never carried out, and never could be, and, in addition, with interest upon that interest. It seems to us an enormous charge. It cannot be reasonable or sound. The land was a waste, a wilderness, and much of it a swamp. It probably never would have had any material value but for the draining operations instituted and carried on by the city on a portion of it. The sales in 1837 were made at a time of public frenzy. One of the witnesses, who had been a deputy sheriff, being asked if he knew at what price real estate sold in 1837, said : " I was at the time in a notary's office with my uncle ; and I remember it was a kind of frenzy. You could hardly buy a lot without being offered triple the price for it. Lawyers made fortunes by it, like Mr. Pepin. Property behind the paper mill was sold, and when people went there to look at [it] there was three or four feet of water, and they paid a big price for it." Dr. Labatut being asked in reference to the Blanc tract, testified as follows : " I know that Mr. Blanc bought it. I don't know when it. was." Being asked if he could give a description of what condition that property was in in 1837, he said : " It was simply a forest, had trees on it, and it was not cultivated." The master in his report gives the following abstract, from his point of view, of this class of testimony. He says : " The evidence on behalf of defendant has been chiefly directed to the establishing of the alleged facts — that the soil so left vacant and unimproved was not fit for use ; that it would have been money thrown away, a waste of energy and substance, even to have endeavored to do anything with it ; that for years, the end of which has not come, it had been and was destined to remain barren and untouched by the hands of man ; and that, therefore, complainant could take nothing on

account of her dispossession, even though it had lasted for a period of some forty-five years. To substantiate this view of the case, sixteen witnesses were examined before the master, several of whom being amongst the oldest citizens in this city. Few of those oldest witnesses have any distinct remembrance or knowledge of the exact locality in contest, the 'Blanc tract,' but all remember the city when it was nothing but a marsh, first, from Rampart back to Claiborne Street, a distance of six squares back from the old square or body of the city (carré de la ville), and then from Claiborne back to Broad Street, ten squares from Claiborne, Dorgenois Street, one square from Broad towards Claiborne, being the limit of said tract on the river side. And a few also remember that in 1837 all of this 'Blanc tract' was swampy, frequently a hunting-ground for three of them, often inundated in heavy rains, and two of them say the land was partly high and partly low. But they all say the city has progressed since then; it is solidly built all along the front of the tract from Rampart to Broad, and that part of the city is well settled. Some of the witnesses had been and are yet the owners of large tracts or parcels of land in and around the city, and had not been able to make anything out of them. Some had tried and had failed to obtain revenues from a few of their squares; others had not tried at all, deeming it beforehand a hopeless task. One of the oldest had purchased a piece of vacant land many years ago, and did not keep it long vacant, over five or six months and built on it as soon as he could, so as to derive revenue from it. Witness did not think it produced a revenue whilst vacant, not well remembering, but inferring this from the fact of his building, for, says he, when vacant property produces a revenue you don't build on it to make it produce a revenue. Another witness says that in the aggregate property has produced no revenue whatever since 1868, taking as data for his opinion the decreased assessed value of property. Another witness testified that in his opinion $2\frac{1}{2}$ per cent or 3 per cent is all that improved real estate could produce here; that this was also the opinion he had heard expressed years ago by agents of extensive land property; that so it was in

his case when abroad some thirty-five years ago, his property being attended to by an agent, but that when he returned home and managed for himself he did a little better.  Another witness was agent for several years of a large estate, and is so yet, there being in that estate a piece of ground on the outskirts of the city covering over five hundred acres, with good outbuildings and dwelling-house, which did not bring over $600 per year, though it brought at one time, after the war, $2400 per annum; but when asked if it had ever been used or attempted to be used as city property, answers in the negative.  His principal had owned a piece of land in this 'Blanc tract,' but had never attempted to make it produce a revenue on account of the pending suit in eviction, and he adds that even without the suit in eviction nothing could have been made out of it, because vacant property is not wanted by anybody.  Another says that the squares of this tract, from Broad along Canal Carondelet are worth nothing at all; but that all of this land, even along the Canal Carondelet, was salable from 1860 to 1870, provided there was nothing of Gaines's claim on them; and that, for seven or eight years, no vacant ground, high or low, can, in witness' opinion, be rented in this city.  Another says there was no diligence by which the owner of vacant property in the Gaines claim could have made it produce a revenue without improving it.  Two of the witnesses state that this property, as all low lands in this city, needed ditching as well as artificial drainage in order that it might be built upon; and one of them, that this tract began to be drained artificially by machinery about the time of its purchase by the city.  And the preceding witness, who states that the vacant property in the Gaines claim could not yield a revenue without improvements — would be too expensive, and that he would not make them on any one square for its ownership.  The great inflation of the price of real estate in this city in 1837 was also testified to by several of the witnesses, together with the disastrous effect of the panic of that year in depreciating the value of property."

Notwithstanding this evidence, and a great deal more to the same purport, the master reasoned that, because some

people improved their land and obtained good revenues from it, the city, or its grantees, might have done the same; and that a possessor in bad faith is chargeable with all that can be made out of the property. We think that there are two errors in this reasoning. First, it does not follow that because small parcels of land in the suburbs of the city may be made profitable by cultivation and improvement, therefore the whole suburbs can be turned to account in the same way. There are hundreds of acres in the vicinity of Washington, for example, lying open and in common. A German gardener may purchase a small lot, and by his industry make it produce a large revenue; and another might erect a saloon and get a reasonable custom. But it would be impossible to convert the entire suburbs, consisting, perhaps, of more than a thousand acres, into market gardens and beer saloons, or to build cottages or rows of houses on them to any advantage. The small examples are exceptions. Large outlying tracts have to abide the natural growth and spread of the city. They may lie unproductive in the hands of the most provident men for years.

Another error made by the master, and by the court, is, as to the extent to which the rule is to be carried, that a possessor in bad faith is bound to respond for all that the property possessed can be made to produce. We do not understand that this rule requires a possessor to change the state of the property. Suppose, for example, a large tract of land is wild, mostly forest, and might be made to produce immense yields of grain and produce if it were cleared of timber and broken up and cultivated. Is the possessor in bad faith — only technically such perhaps — bound to respond to the true owner, on recovery, for the thousands of bushels of wheat and corn and other produce that might have been raised on the land? Is it the duty of a possessor, even a possessor in bad faith, to change the state of the land from wild land to cultivated, farming land, for example, or to open and work mines of iron or copper or gold, so as to make as much out of the land as can be made out of it, and hand it over to the true owner? Does any such principle as this prevail in the law? We think not. The estimation of such undeveloped revenues is alto-

gether too speculative a matter. It is true, the master does not enter into an account of what might have been, but, under the idea that a great deal might have been made out of the land, assumes the arbitrary basis of the crazy prices of 1837, and charges the city with the interest on them, and interest on that interest; and no wonder that the decree is swelled up to nearly two millions of dollars.

The truth is, that there are degrees of bad faith. There are some possessors who, without any title at all, pertinaciously keep the true and known owner out of possession. They may be properly called knavish possessors. There are others who take a conveyance and go into possession in entire ignorance of any defect in their title, though they are technically possessors in bad faith, because by proper inquiry they might have discovered the defect. Such possessors, certainly, cannot be placed on the same level with the knavish and fraudulent possessors of whom we have just spoken. In the case of *Donaldson et al.* v. *Hull*, 7 Martin (N. S.) 112, 113, Judge Martin, delivering the opinion of the court in a case of mere technical possession in bad faith, said: "The case appears peculiarly a hard one, as the defendant bought in *moral* good faith, with the knowledge of the only one of the plaintiffs who was of age, and from the aunts of all of them, who had been selected by their mother to protect their interests after her death, and as the plaintiff who was of age received from him her part of the price. It is to be lamented that the law imposes on courts of justice the obligation of decreeing the restoration of the value of the services of slaves against a possessor who has fairly paid a full price for them, while it authorizes them to do no more in the case of a dishonest holder, who has taken them in possession without paying anything for them. But on assessing the value of the services which a defendant is to be decreed to restore, we think the same rule ought not to prevail. In assessing damages for their detention, the good faith or dishonest conduct of a defendant should influence us; and if justice demands vindictive damages in the latter case, it prescribes a just moderation in the former. The plaintiff must not receive more than he would if he had been in possession."

In the present case, notwithstanding the strong language which has been applied to the city of New Orleans in resisting so perseveringly the claims of Mr. Gaines, we cannot but express our conviction that those claims have been opposed in entire good faith. When the city purchased the land, no one dreamed of any defect in the title. Only one will was known, and by that will Mary Clark, the mother of the testator, was made universal heir and legatee. She had accepted the heirship; her giving a power of attorney to sell the lands of the estate indicated that; and her subsequent conduct all went to the same point. Mrs. Gaines, in her first bill, alleged that Mary Clark had accepted the inheritance and taken possession. Why should any one have doubted of the title? Nevertheless, a majority of this court has held that the vice in the title ought to have been known to the purchaser. We abide by that decision, but we cannot shut our eyes to the fact that it was not a moral but a mere technical failure of duty on the part of the purchaser not to have discovered a defect in the title.

Then the evidence to sustain the claims of Mrs. Gaines was so full of obscurities and improbabilities that a possessor of land purchased from the representatives of Daniel Clark could not be blamed for not giving it credence, and for resisting her suits to the utmost. We have given an outline of the history of her litigation for the purpose of showing how great reason the parties attacked in their possessions had to defend themselves with vigor. A full report of the evidence would have shown it still more strongly. We cannot blame them for making resistance. Although bound by the decisions that have been made by this court in the matter, we cannot say, and no one can say, that there was not much evidence of a very strong character in favor of a contrary conclusion.

In our judgment, there was no sufficient evidence that any rents or revenues were derived from the unimproved lands, either by the city of New Orleans, or by its grantees; and that part of the decree which is based on such supposed rents and revenues, amounting to $1,348,959.91, must be disallowed, and the bill must be dismissed with regard thereto.

As to the residue of the decree, amounting to $576,707.92, founded on the judgments recovered against persons in possession of various portions of the property, claiming under sales made by the city of New Orleans, whilst those persons would have been proper parties to the suit, in order that it might appear that the sums recovered against them had not been released or compromised for less amounts than the face of the judgments, and that they might be bound by the decree, still, as the objection of want of parties was not specifically made, and as it would be a great hardship on all the parties concerned to have to begin this litigation over again, we do not think that the bill should be dismissed on that ground, but that the said sum of $576,707.92 should be allowed to the complainant, with interest thereon, as provided in the decree of the Circuit Court, subject, however, to the qualification that if the defendant can show that any of the said judgments have been compromised and settled for any less sums than the face thereof, with interest, the defendant should be entitled to the benefit of a corresponding reduction in the decree; and a reasonable time should be allowed for the purpose of showing such compromises if any have been made.

The result is that the decree of the Circuit Court must be

*Reversed and the cause remanded, with instructions to enter a decree in conformity with this opinion.*

The CHIEF JUSTICE and MR. JUSTICE LAMAR were not members of the court when this case was argued, and took no part in its decision.

----

*New Orleans v. United States ex rel.: Gaines's Administrators; New Orleans v. United States ex rel.: Gaines's Administrators.* Appeals from and in error to the Circuit Court of the United States for the Eastern District of Louisiana. Nos. 2, 3. Argued October 13, 14, 1887. Decided May 13, 1889. MR. JUSTICE BRADLEY delivered the opinion of the court. The decision just made in the case of *The City of New Orleans v. Myra Clark Gaines* renders it necessary that the judgment or decree in this case should be reversed, and

it is reversed accordingly, and the cause remanded with instruc-
tions to dismiss the petition.

*Reversed.*

*Mr. Henry C. Miller* and *Mr. J. R. Beckwith* for appellant. *Mr.
John A. Campbell, Mr. Thomas J. Semmes* and *Mr. Alfred Gold-
thwaite* for appellees.