### NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Plaintiff,

v.

### Ronald TEGTMEIER, Defendant.

### No. 85 Civ. 7402 (LLS).

United States District Court, S.D. New York.

Nov. 23, 1987.

D'Amato & Lynch, New York City (Richard F. Russell, Stephen J. McCahey, of counsel), for plaintiff.

Liddle & O'Connor, New York City, Page & Logue, Atlanta, Ga. (Andrew S. O'Connor, Owen D. Kurtin, New York City, J.

Boyd Page, Donald A. Bacek, Atlanta, Ga., of counsel), for defendant.

## OPINION AND ORDER

STANTON, District Judge.·

This is one of over 350 cases presently before this Court in which plaintiff National Union Fire Insurance Company of Pittsburgh ("National Union"), an issuer of financial guarantee bonds, is suing to enforce an indemnity agreement between itself and a limited partner in one of scores of tax shelter partnerships in various parts of the country, and also to enforce its rights as subrogee of promissory notes which it honored on his behalf. National Union had guaranteed, to those who advanced funds to the partnership enterprise, that the limited partner would make all of his capital contributions represented by his promissory notes to the partnership. When, for any of a variety of reasons, the limited partner stopped making his required contributions, National Union made them on his behalf. Now it sues the limited partner for reimbursement, under an indemnity agreement he gave National Union at the time it guaranteed his payments, and as subrogee on the unpaid note.

National Union moves for summary judgment on the indemnity agreement and the note. The defendant limited partner, here Ronald Tegtmeier, cross-moves for summary judgment on the ground that he rescinded the partnership agreement. Neither party has identified any material issue of disputed fact that would require a trial of this action.

## FACTS [1]

Mr. Tegtmeier was contacted by representatives of FSC Securities Corp. ("FSC") about investing in Spanish Trace Investors, Ltd., ("Spanish Trace") a Missouri limited partnership. On or about July 2, 1984, Tegtmeier executed and delivered to FSC the documents required to purchase forty-nine limited partnership interests in Span-

---

1. The facts set out in this opinion are taken from uncontradicted statements in the affidavit of Ronald Tegtmeier in opposition to National Union's motion for summary judgment, defendant's statement pursuant to local rule 3(g), the affidavit of Raymond W. McDaniel in support of National Union's motion for summary judgment, and plaintiff's statement pursuant to local rule 3(g).

ish Trace, including a check for $11,000, a promissory note in the principal amount of $38,000, payable in installments, and an agreement promising to indemnify National Union for any sums it might pay to the partnership or its assigns to cure any default by him under the note. On or about July 13, 1984, Tegtmeier executed a second promissory note, which was backdated to July 2, 1984, to substitute for the first. Sometime after he executed this second note, Tegtmeier was told by FSC representatives that they were increasingly doubtful about the wisdom of investing in Spanish Trace. The Spanish Trace offering documents stated that Tegtmeier could revoke at any time prior to acceptance by the general partners. On or about July 19, 1984, Tegtmeier told Clark Underwood, an FSC representative, that he wished to rescind his investment in Spanish Trace. Shortly thereafter, Mr. Underwood told him that the rescission had been communicated to Spanish Trace. Spanish Trace returned some of the original signed documents, along with Tegtmeier's check for $11,000. However, the promissory note was not returned, nor were the original application for a financial guarantee bond and the original indemnity agreement.

On June 21, 1984, National Union had issued to Williamsburgh Savings Bank (the "Bank") a financial guaranty bond guaranteeing payment of the notes executed by the Spanish Trace limited partners. On August 28, 1984, National Union amended the bond to guarantee the notes of seventeen additional investors, including Tegtmeier. Spanish Trace negotiated Tegtmeier's note to the Bank. Tegtmeier made no payments on the note. Upon being notified of the default, and without prior notice to Tegtmeier, National Union made payments to the Bank on Tegtmeier's behalf in the total amount of $23,228.91, which it now seeks to recover.

## DISCUSSION

In its motion for summary judgment, National Union claims that it is entitled to reimbursement under both the indemnity agreement and as subrogee of the Bank on the promissory note for the funds it has paid on Tegtmeier's behalf. National Union claims that any personal defenses, such as rescission, that Tegtmeier may have against the general partner are cut off because the Bank took the note as a holder in due course, and that as subrogee to the extent that it has made payments under the note, National Union has the same rights as the Bank.

In his cross-motion for summary judgment, Tegtmeier asserts that he rescinded the partnership agreement, and therefore has no liability on the note or the indemnity agreement. He asserts that neither the Bank nor National Union is a holder in due course because the note was not negotiable and because the Bank had notice that he had an "unlimited" right to rescind.

### A. Rescission of the Partnership Agreement

Tegtmeier argues that he is not liable to National Union because he effectively rescinded his investment in Spanish Trace, never became an owner of a limited partnership interest, therefore had no liability on the note, and therefore did not default on it.

■ However, rescission is not a defense against a holder in due course of a note. Uniform Commercial Code ("U.C.C.") § 3–207(2). Therefore if, as held *infra*, the Bank is a holder in due course, his rescission affords Tegtmeier no defense in this action.

### B. Holder in Due Course Status

Tegtmeier challenges National Union's status as a holder in due course on two grounds: that (1) the note was nonnegotiable; and (2) the Bank took the note with notice that Tegtmeier had an unlimited right to rescind.

#### 1. Negotiability

■ The note provides for interest at ten percent per annum before maturity, and for interest after default of "two percent (2%) above the 'prime rate' then being charged (adjusted on a monthly basis) by the RepublicBank Dallas, N.A. ...." Tegt-

meier challenges the negotiability of the note, claiming that the amount payable is uncertain because the interest rate after a default cannot be determined without reference to the prime rate. To be negotiable, an instrument must contain an unconditional promise or order to pay a sum certain. U.C.C. § 3–104(1)(b). Section 3–106 states that: "(1) The sum payable is a sum certain even though it is to be paid (a) with stated interest or by stated installments; or (b) with stated different rates of interest before and after default or a specified date." Official Comment 1 to § 3–106 states that:

> It is sufficient that at any time of payment the holder is able to determine the amount then payable from the instrument itself with any necessary computation.... The computation must be one which can be made from the instrument itself without reference to any outside source, and this section does not make negotiable a note payable with interest "at the current rate."

Courts and U.C.C. commentators have agreed that an interest provision that cannot be determined without reference to the prime rate, even if it specifies the prime rate of a particular bank, renders a note nonnegotiable, because the purchaser of the note must look beyond the face of the note to determine how much is owed on the note at the time of payment. *Taylor v. Roeder*, 360 S.E.2d 191 (Va.1987) (interest at "three percent (3%) over Chase Manhattan Prime to be adjusted monthly" renders note nonnegotiable); *Northern Trust Co. v. E.T. Clancy Export Corp.*, 612 F.Supp. 712 (N.D.Ill.1985) (interest at ½% above prime renders a note nonnegotiable); *A. Alport & Son, Inc. v. Hotel Evans, Inc.*, 65 Misc.2d 374, 317 N.Y.S.2d 937 (Albany Co. 1970) (interest "at bank rates" renders a note nonnegotiable); 4 Hawkland, U.C.C. Series § 3–106:03 at 95 n. 5; 2 Hart & Willier, Bender's U.C.C. Series § 2.11[2] at 2–103; Leary, U.C.C. Handbook at 95.

National Union cites several cases for the proposition that interest rates determined by reference to a "prime" rate are not uncertain. These cases, however, do not deal with negotiability of a note under U.C.C. § 3–104(1)(b), but with the application of state usury laws. *Matter of Le-Blanc*, 622 F.2d 872, 878–79 (5th Cir.1980) ("prime plus 4%" is "fixed in writing" as required by the Louisiana usury laws); *Bank of Maine, N.A. v. Weisberger*, 477 A.2d 741 (Me.1984) ("prime + 1%" constitutes "an agreement in writing establishing a different rate" than the statutory maximum of 6% under Maine usury law); *Associated East Mortgage Co. v. Highland Park, Inc.*, 374 A.2d 1070 (Conn.1970) (3% above prime rate does not fail for being "vague and indefinite" under Connecticut usury law).

In *Universal C.I.T. Credit Corp. v. Ingel*, 347 Mass. 119, 196 N.E.2d 847, 851 (1964), the court held that a provision for "interest after maturity at the highest lawful rate" did not render a note nonnegotiable under U.C.C. § 3–104(1)(b). The court relied upon a Massachusetts statute that provided for interest at a maximum rate of six percent unless the parties agreed otherwise in writing. The court stated that, under the U.C.C., a note that provides for payment "with interest" is negotiable because the interest term is supplied by § 3–118(d), which states: "Unless otherwise specified a provision for interest means interest at the judgment rate at the place of payment from the date of the instrument ...." *See also* Hart & Willier, *supra*, at 2–103 n. 10. Thus, the Massachusetts court held that the term "at the highest lawful rate" is no less certain than "with interest," since the Massachusetts statute supplies the interest term, and therefore would not render the note nonnegotiable.

The note Tegtmeier signed did not refer to a statute, nor did it leave room for a statute to supply the rate of interest that would apply. Therefore, the rationale of *Universal C.I.T.* does not apply. Following the logic of *Taylor*, *Northern Trust* and *Alport*, the rate of two percent above prime would render the note nonnegotiable if it applied to the entire life of the note.[2]

2. Several commentators have argued that strong policy reasons exist for negotiability of a note

That is not true of this note, which provides for interest at ten percent per annum before maturity, with a rate of two percent above RepublicBank's prime after a default. In *Taylor, Northern Trust* and *Alport* the courts were construing the effect of a stated interest rate prior to maturity. The *Universal C.I.T.* court was concerned with a post-default interest rate, but because it decided that the provision for interest "at the highest lawful rate" did not render the note nonnegotiable, it did not address the significance of a default.

After a default, the negotiability of the note is irrelevant. Hart & Willier state that "Once an instrument has matured, it no longer has its function as a money substitute and it is immaterial whether it is payable thereafter in a sum certain. No person can become a holder in due course, and it will not circulate in the business community." Hart & Willier, *supra,* at 2–103 (footnote omitted). Once there has been a default on the note, no person who has notice of the default can become a holder in due course. U.C.C. § 3–302(1)(c). It is clear from the face of a note that is payable on a specific date whether there has been a default, giving the potential purchaser notice that it is overdue.

After a default, the note is no longer transferable except subject to the personal defenses of the maker. It is therefore irrelevant that the amount due after a default is not a sum certain. As long as the interest due can be computed from the face of the note itself at the time payment is due, it is immaterial that computation of the interest due after a default requires reference to an outside source. Since the note that Tegtmeier signed provided for a fixed ten percent rate of interest until maturity, the fact that the interest rate after default cannot be determined except by reference to the prime rate charged by RepublicBank Dallas does not render the note nonnegotiable before a default has occurred.

whose rate of interest is determined by reference to the prime rate. Hawkland, *supra;* Hart & Willier, *supra;* Leary, *supra; see also Taylor*

673 F.Supp.—29

### 2. Notice of an Unlimited Right of Rescission

■ Tegtmeier also challenges the Bank's status as a holder in due course because he claims that it took the note with notice that he had an unlimited right of rescission. The U.C.C. provides that a holder in due course must take the instrument "without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person." U.C.C. § 3–302(1)(c). The note itself does not state that Tegtmeier had a right to rescind, nor does the indemnity agreement. The cover and index page of the documents that Tegtmeier received in connection with the transaction state: "PENDING REVIEW AND ACCEPTANCE BY THE GENERAL PARTNERS, A SUBSCRIBER MAY REVOKE HIS INTENDED INVESTMENT WITHOUT OBLIGATION." Assuming for the purposes of discussion that the Bank had notice of this statement, Tegtmeier argues that it had notice of an unlimited right to rescind that would constitute a defense to the note under U.C.C. § 3–302(1)(c).

The New York Court of Appeals has held that a holder who takes with notice that the maker has an absolute right to rescind is not a holder in due course. *First International Bank of Israel, Ltd. v. L. Blankenstein & Son, Inc.,* 59 N.Y.2d 436, 465 N.Y.S.2d 888, 891–92, 452 N.E.2d 1216, 1219–20 (1983):

> [k]nowledge that an agreement is rescindable at will similarly provides the holder with notice that a defense to the performance of the agreement has arisen and such notice precludes the holder from asserting that he is a holder in due course. . . .

The statement in the offering documents did not make the note rescindable "at will." The most that Tegtmeier can say is that the Bank knew, from a source other than the note, that he had an absolute right to rescind his investment prior to its acceptance by the general partners. Spanish

*v. Roeder,* 360 S.E.2d 191, 195 (Va.1987) (Compton, J., dissenting).

Trace's negotiation of the note would normally be consistent with its acceptance, not with Tegtmeier's rescission, of the investment. As far as it appeared to the Bank, when Spanish Trace negotiated the notes to it the general partners had accepted Tegtmeier's investment, and his right to rescind had been extinguished. It would be "unreasonable to expect in this situation that [the Bank] foresee improprieties in the underlying transaction which would later be disclosed" *Chemical Bank of Rochester v. Haskell*, 51 N.Y.2d 85, 432 N.Y.S.2d 478, 481, 411 N.E.2d 1339, 1342 (Ct.App.1980), or to investigate any possible defenses that Tegtmeier may have had to the note, *Third National Bank in Nashville v. Hardi-Gardens Supply of Illinois, Inc.*, 380 F.Supp. 930, 941 (M.D.Tenn.1974). Therefore, the Bank would have had to have actual notice that Tegtmeier had in fact rescinded his investment in Spanish Trace for Tegtmeier to be able to raise this defense. *Indyk v. Habib Bank Ltd.*, 694 F.2d 54, 57 (2d Cir.1982); *Chemical Bank of Rochester, supra;* U.C.C. (N.Y.) § 3–304(7) (McKinney's 1964).

Tegtmeier does not allege that he communicated his intent to rescind to either the Bank or National Union. Nor does he allege that the Bank or National Union had actual knowledge that he had rescinded the partnership agreement. Therefore, the Bank did not have notice of a claim or defense to the note that would defeat the Bank's status as a holder in due course under U.C.C. § 3–302(1)(c).

C. Other Defenses

Tegtmeier interposed ten affirmative defenses to National Union's amended complaint. They are not urged upon these motions, with the exceptions discussed above, and are accordingly denied. Fed.R. Civ.P. 56(e).

## CONCLUSION

Plaintiff National Union's motion for summary judgment is granted, and the Clerk will enter judgment in favor of National Union in the amount of $23,228.91, plus costs and interest. Defendant Ronald

Tegtmeier's cross-motion for summary judgment is denied.