OPINION
SAND, District Judge.
In this multidistrict ease consolidated before this Court for pre-trial matters, investors in Gas Reclamation, Inc. (“GRI”) bring suit for violations of federal securities laws, the Racketeer Influenced and Corrupt Organizations Act, common law and various state statutes. We assume familiarity with the general factual background of the claims asserted and with this Court’s prior decisions. See In re Gas Reclamtion, Inc. Sec. Litig., 733 F.Supp. 713 (S.D. N.Y.1990); In re Gas Reclamation, Inc. Sec. Litig., [1987 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 93,731, 1988 WL 45632 (S.D.N.Y. Apr. 18, 1988); In re Gas Reclamation, Inc. Sec. Litig., 659 F.Supp. 493 (S.D.N.Y.1987). Before the Court today are three separate groups of motions, and we address each in turn.

I. Banks’ Motions for Partial Summary Judgment

The Connecticut National Bank (“CNB”), Ensign Bank FSB (“Ensign”), Morris County Savings Bank (“Morris”) and Privat-banken A/S (“Privatbanken) (collectively, the “Banks”) move for partial summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, on their cross-claims against Northwestern National Insurance Company, of Milwaukee, Wisconsin (“Northwestern”) for payment on various surety bonds. We grant their motion.
The Banks hold a group of promissory notes (“Notes”) made at various dates between April and October 1984 by investors in Gas Reclamation, Inc. (“GRI”) to finance their purchases of gas reclamation units. Each Note requires equal quarterly payments of principal and interest over a term of approximately four and one-half years and at an interest rate set at a specified percentage over a specified prime rate. In the case of default in any payment and other specified events, each Note would, at the option of the holder, become immediately due and payable, and the interest rate would be increased to three-percent over the non-default rate. As part of the several transactions in which the Banks acquired the Notes, Northwestern, as surety for the investors, issued eleven Financial Guarantee Bonds (“Bond”) which guaranty payment of principal and interest on the Notes. The Notes were originally issued to the Intercontinental Monetary Corporation (“IMC”) and Privatbanken; IMC subsequently assigned the Notes it held to CNB, Ensign and Morris.
GRI collapsed almost immediately. Most of the investors never made any payments to the Banks, and almost all of the Notes are now in default. In their original consolidated complaint, the investors asserted several securities laws and other claims against the Banks, and this Court denied the Banks’ motion to dismiss those claims in its Opinion of April 9, 1987, In re Gas Reclamation, Inc. Sec. Litig., 659 F.Supp. 493 (S.D.N.Y.1987). From the first defaults in early 1985 until October 1987, Northwestern made certain payments to the Banks on each of the defaulted Notes to comply with its understanding of its option to cure the investors’ defaults. On October 6, 1987, in response to this Court’s denial of the motions to dismiss, Northwestern stopped making payments to the Banks on the defaulted Notes, claiming that the investors’ claims against the Banks, if proven, would constitute defenses to payments under the Bonds.
After discovery was completed, most of the investors stipulated to the discontinuance of their claims against the Banks, and ■ the Banks withdrew their claims against the investors. On August 11,1989, each of the Banks served on Northwestern amended pleadings asserting the claims on which the Banks now seek summary judgment. The Banks argue that Northwestern has breached the Bonds and that the Banks are entitled to payment of each defaulted Note in full, including default interest from the date of investor default on each Note.
*1097 Each Bond imposes an unconditional obligation on Northwestern to pay the Banks upon the default of any investor on an underlying Note: “The Surety [Northwestern] shall pay Loss hereunder in immediately available funds no later than fifteen (15) days after the receipt of Notice of Default_” Bond, 118. The parties do not dispute that the Banks hold the Notes, that the Notes are in default, that Northwestern issued the Bonds which insure payment of the Notes, and that Northwestern stopped making payments in October 1987. Northwestern advances three arguments in opposition to the Banks’ motions.
A.
First, Northwestern argues that this Court should stay its decision on the Banks’ motions for partial summary judgment until after this Court decides Northwestern’s motion to enforce its rights of quia timet and exoneration against the investors. Since in this Opinion, we also decide Northwestern’s motion, Northwestern’s request for a stay is moot.
B.
Second, the Banks and Northwestern disagree as to the amount of Northwestern’s liability under the surety Bonds. There is no dispute as to which Notes are covered by the surety Bonds and the original principal amount of those Notes. The disagreement concerns the amount of interest due and the method for calculating the credit owed to Northwestern for the payments it has already made to the Banks. The Banks argue that Northwestern must pay principal plus default interest from the original date of default for each investor, less a credit for the amounts Northwestern paid during the time it chose to cure the investors’ defaults. The Banks would apply such credit first to the default interest due and then to reduce the outstanding principal balance. Since Northwestern’s payments from early 1985 to October 1987 did not include default interest, such calculation would result in incomplete principal payments during that period. Northwestern argues that it is not required to pay any default interest, but instead owes principal and interest from the time it stopped curing the investors’ defaults in October 1987. Alternatively, Northwestern argues that if it does owe default interest, such additional interest is not due for the period during which it cured the investors’ defaults. Finally, Northwestern argues that even if it did owe default interest from the time of each investor’s original default, its agreement with the Banks provides that Northwestern should nonetheless receive credit for full and timely principal payments from early 1985 to October 1987, the period it chose to cure the investors’ defaults.
To resolve this dispute, this Court must look to the language of the surety Bonds and the Notes. “[Sjummary judgment is appropriate where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning.” United States v. 0.35 of an Acre of Land, 706 F.Supp. 1064, 1070 (S.D. N.Y.1988) (citations omitted). The court must decide as a legal matter whether a contract is ambiguous, and “contract ambiguity is not established simply because the parties disagree as to the meaning of a particular provision.” Id. (citations omitted). On motions for summary judgment, courts must give effect to the objective intent of the parties as indicated by the unambiguous terms of their written agreements.
The parties do not dispute that all the Notes provide for acceleration in the event of default and for a three-percent increase in interest after the Notes become due, either at stated maturity or on acceleration. Paragraph eight of all of the surety Bonds requires Northwestern to pay the “Loss,” which all the Bonds define in substantially the same way as:
“Loss” as to any Note shall mean the aggregate amount of unpaid principal plus accrued and unpaid interest on the Note which is in Default, such interest to be calculated at the rate specified in such Note from the date interest began to accrue until the date on which the Surety pays such Loss hereunder in accordance
*1098 with Section 8. Notwithstanding anything to the contrary herein Loss shall exclude penalties of any nature and expenses of collection, and shall be reduced by any payments of principal made by or on behalf of the Defaulting Principal before payment by the Surety. The aggregate of all Losses under this Bond shall not exceed the Limit of Liability.
Bond, 111(c) (emphasis supplied). The only material difference in the surety Bonds’ definitions of “Loss” is that the Privat-banken Bonds omit the italicized language excluding “penalties.”
Northwestern argues that the three-percent increase in interest on default is a “penalty” that is excluded from the definition of “Loss” in all but the Privatbanken Bonds. We disagree. The surety Bonds all provide for the application of New York law. Under New York law, an agreement to pay an increased interest rate on default is not a penalty, but compensation for the increased risk of non-collection. See Citibank, N.A. v. Nyland (CF8), Ltd., 878 F.2d 620, 624-25 (2d Cir.1989) (following Ruskin v. Griffiths, 269 F.2d 827 (2d Cir.1959), cert. denied, 361 U.S. 947, 80 S.Ct. 402, 4 L.Ed.2d 381 (1960)); Union Estates Co. v. Adlon Constr. Co., 221 N.Y. 183, 187, 116 N.E. 984 (1917) (“Likewise, an agreement to pay interest upon a loan from its date until its payment at a rate before and a differing rate after its maturity is an agreement to pay interest and not a penalty as to the latter rate.”). Because New York law provides a clear definition for the term “penalty” as used in the same context, we determine that there is no ambiguity as to its meaning. This Court, therefore, cannot consider the subjective intent of Northwestern’s loan officer as to whether he believed that the surety Bonds would exclude payments for default interest.
Northwestern also argues that the investors’ defaults did not increase the risk of non-collection to the Banks because Northwestern remained guarantor of the payments — both before and after defaults by the investors, the Banks could and did look to Northwestern’s credit to evaluate their risk. However, as the history of this multi-district lawsuit indicates, the risk to the Banks of non-collection did increase after default despite Northwestern’s guarantee of payment. Moreover, the Second Circuit rejected the same argument in Citibank when it recognized that there was an increased risk of non-collection after default on a loan secured by real estate even though the value of the collateral exceeded the amount due. Citibank, 878 F.2d at 625. We find that the unambiguous definition of “Loss” in the surety Bonds does not exclude any default interest due.
Next, we must determine the amount of default interest Northwestern is required to pay. The parties do not dispute that each Note provided that “[ujpon default in any payment hereunder (whether by acceleration or otherwise), the remaining payments shall, at the option of the holder, become immediately due and payable” and that:
Upon the happening, with respect to any Maker, endorser or guarantor of this Note ... of any of the following events: ... default in payment of principal or interest ... then, ... this Note, if not then due, shall, at the option of the Payee or holder hereof, become due and payable immediately without demand or notice. After this Note becomes due, at stated maturity or on acceleration, any unpaid balance hereof shall thereafter bear interest until paid at a rate of 3 percent more than the rate provided for above....
The surety Bonds provide in paragraph five that the holder of the Note must give Northwestern written notice of any principal’s default within sixty days, and in paragraph eight, Northwestern is required to pay the Banks within fifteen days of receipt of such notice. The surety bonds, however, permitted Northwestern to cure any investor default:
Surety shall have the option to cure a Default under any of the Notes by paying to Obligee or Permitted Assignee (whoever holds the Notes) the amount due thereunder, within fifteen (15) days of its receipt of Notice of Default thereunder in accordance with paragraph five (5) thereof. In such event there shall be *1099 no acceleration of the subject Note or other Notes made by the defaulting Principal and thereafter due, if such Note is subject to acceleration by the terms thereof. In such event, the Surety shall thereafter make payment when due....
Bond, ¶ 2 (emphasis supplied).
In early 1985, when most of the investors did not make the required interest and principal payments to the Banks, Northwestern elected to cure those defaults. According to the express terms of the surety bonds, the Banks cannot accelerate the Notes if Northwestern elects to “cure,” and therefore, no default interest was then due. Northwestern continued to cure the investors’ defaults until October 1987, making each quarterly payment of interest and principal to the Banks on each of the Notes in default. For the period until October 1987, Northwestern does not claim that the Banks failed to provide appropriate notice, and the Banks do not claim that Northwestern’s payments were untimely or insufficient to cover the principal and non-default interest due.
In October 1987, Northwestern informed the Banks that it would no longer make quarterly payments to cure the investors’ defaults. At that point, according to the express terms of the Notes, the remaining payments were, “at the option of the Payee or the holder ... due and payable immediately without demand or notice.” Northwestern concedes that two of the Banks, Morris and Privatbanken, notified Northwestern after October 1987 of their intention to accelerate the Notes they held. See Northwestern’s Supplemental Brief in Opposition to the Banks’ Motion for Partial Summary Judgment at 2, 5, 7-8; Affidavit of H. Adam Prussin dated June 29, 1990, Ex. 3 (Morris letter dated October 5, 1988 “demanding] immediate payment of the entire amount of unpaid principal on each of the Principal’s Notes plus all accrued and unpaid interest thereon” at the default rate of interest), Ex. 8 (Privatbanken letter dated March 21,1988 stating that “[w]e are not waiving or modifying our position regarding full acceleration of the defaulted notes ...” and “hereby demanding full payment under the above Bond.”); Affidavit of Jan Paulin dated June 26, 1990, Ex. D (Privatbanken letter dated February 10, 1988). Northwestern however argues that the other two Banks, CNB and Ensign, never provided unequivocable evidence of their intention to accelerate the Notes they held after Northwestern stopped curing the investors’ defaults in October 1987. We disagree. The express terms of the Notes provide that no notice or demand is required to accelerate payment. CNB and Ensign clearly wrote letters to Northwestern after October 1987 stating their understanding that the Notes they held had been previously accelerated. See Affidavit of H. Adam Prussin dated June 29, 1990, Ex. 6 (Ensign notices of default and proofs of loss, dated October 27, 1987, stating: “This Notice of Default/Proof of Loss shall not be deemed a waiver of the undersigned’s option to accelerate said Principal’s note (the undersigned has accelerated said note by notice dated 5/31/85).”), Ex. 10 (CNB letter dated December 9, 1987 stating: “This Notice of Default/Proof of Loss shall not be deemed a waiver of the undersigned’s option to accelerate the Principals notes. The undersigned has accelerated said notes by notice dated April 10, 1985.”). In fact, those notices simply repeat the language contained in the prior notices sent by the Banks to Northwestern at each quarterly payment date. Even if those letters were technically incorrect because Northwestern’s cure prevented acceleration in early 1985, Northwestern clearly knew after October 1987 that the Banks intended to exercise their option to accelerate all remaining payments. Moreover, in a letter to Northwestern’s counsel at the time Northwestern was considering ceasing to cure the investors’ defaults, the Banks’ counsel made it clear that the Banks believed that the Notes had been accelerated and that full payment of principal and interest was due. See Affidavit of Darrell K. Fennell dated June 29, 1990, Ex. E.
It is clear from the correspondence between all the Banks and Northwestern that each Bank intended to accelerate the Notes it held in early 1985 and that each Bank accepted Northwestern’s payments on each *1100 quarterly payment date without prejudice to its rights to later pursue claims for additional default interest. Since the Notes do not require any formal notice of acceleration, we reject Northwestern’s claim that CNB’s and Ensign’s reliance on their 1985 notices of acceleration is invalid. Whether the Banks were required to inform the Investors, Northwestern, or both, of their intention to accelerate payment of the Notes, we find that the evidence submitted in the supplemental affidavits satisfies the provisions in the Notes regarding acceleration. After the Banks’ acceleration of the Notes became effective in October 1987, Northwestern was required by the express terms of the Notes, as incorporated by the definition of “Loss” in the surety Bonds, to pay the default interest rate on the outstanding principal balance of each Note.
The Banks argue that default interest is due from the date of each investor’s original default. The Banks acknowledge that default interest is not due if Northwestern exercised its option to cure the investors’ defaults. However, according to the Banks, Northwestern could only satisfy its option to cure the investors’ defaults by making all the required interest and principal payments on the Notes until their stated maturity. Although Northwestern initially satisfied its obligation to cure, the Banks contend that Northwestern’s decision to stop making payments to the Banks in October 1987 caused a complete violation of Northwestern’s option to cure. Rather than allowing for a partial cure, the Banks argue that Northwestern must retroactively pay the default interest rate for the period from early 1985 to October 1987.
We disagree. Again, we believe that the unambiguous terms of the contract indicate the parties’ intent. Under paragraph 2 of the surety Bonds, no default interest was due while Northwestern was complying with its option to cure. Each time an investor failed to make a quarterly payment, the Bank which held the Note sent Northwestern a Notice of Default/Proof of Loss. Each time Northwestern made payment on behalf of that investor, Northwestern effected a cure. As long as Northwestern continued to make those payments, the Banks could not accelerate the Notes and could not charge default interest. The provision requiring “the Surety [to] thereafter make payment when due” does not mean that only a complete cure will be effective. Instead, that provision simply obviates the need for notice under paragraph five of the surety Bonds and the resultant delay in payment.
In sum, we find that the unambiguous terms of the Notes and Bonds indicate that the amount due under the surety Bonds is the outstanding principal balance of each Note plus default interest due calculated only from the date Northwestern stopped making payments to the Banks in October 1987.
C.
Third, Northwestern argues that “this Court’s decision on Northwestern’s motion for summary judgment against the Investors creates a variety of substantive issues concerning Northwestern’s liability under the bonds and the Banks’ liability on Northwestern’s claim for contribution.” Northwestern Memorandum in Opposition to the Banks’ Motion for Partial Summary Judgment at 2-3. Specifically, Northwestern argues that if the investors have defenses against the Banks on their Notes,[1] then the surety Bonds are unenforceable against Northwestern. As a general rule, a surety may assert against a creditor many defenses of its principal. See 74 Am.Jur.2d, Suretyship § 104 (1974). However, the parties agree that paragraph three of each Bond contains the following specific waiv-er[2]:
*1101 Defenses available to the Surety [Northwestern] or any Principal [investor] against the Obligee [Bank] or Permitted Assignee [Bank] to deny payment of the Notes or of a claim under this Bond due to acts or omissions of the Obligee or Permitted Assignee, or other entity or person (except for changes in the Notes made without the written consent of the Surety or for acts of gross negligence or willful misconduct by the Permitted As-signee) shall not be valid against the Permitted Assignee. Such defenses include but shall not be limited to:
a) the invalidity of any Note;
b) the illegality of any Note;
c) the unenforceability of any Note;
d) the bankruptcy of the Obligee or any Principal;
e) Any defense that the Principal is under no obligation to discharge all or any part of its obligations to the Obli-gee, Permitted Assignee, or any other person under the Note, including any defense relating to the assignment of the Notes or any Principal(s) interest in the Obligee to the Permitted As-signee; and
f) any defense based upon the failure of any Principal to execute this Bond or the failure of the Obligee to perform its obligations under this Bond (other than under paragraph 4).
g) those specific defenses waived under the provision of paragraph 9A.
The parties also agree that each surety Bond included the following additional waiver, first as a rider and then as a provision in the surety Bonds themselves:
9A. Waiver of Defenses
The Surety [Northwestern] acknowledges that (a) it has satisfied itself with respect to all matters affecting it concerning the Notes and the transaction in which they were issued, and (2) the Permitted Assignee [Bank] has made no representation or warranty as to the validity, genuineness or collectibility of any Note. The following shall not relieve the Surety of its obligations to the Permitted Assignee under this Bond:
a. Any misinformation, breach of warranty, fraud, misrepresentation or failure to provide any information by any Principal [investor] or the Obligee [Bank] or any other person (except the Permitted Assignee).
b. Any violation of the securities laws of the United States or of any state of the Obligee, the Permitted Assignee or any other person in connection with the transaction in which the Notes were issued.
c. Any defect in any Note that renders such Note void, voidable, unenforceable or uncollectible, in whole or in part, or subject to any set-off, claim or defense, real or personal, including, without limitation, fraud, forgery or usury.
d. The failure of the Permitted Assign-ee or any payee or endorsee of any Note to be a holder-in-due-course or the non-negotiability of any Note.
Northwestern does not claim that the Banks engaged in “acts of gross negligence or willful misconduct” or violated the exclusion for “any misinformation, breach of warranty, fraud, misrepresentation or failure to provide any information” by the Banks. Northwestern is therefore required by the terms of the Bonds to pay to the Banks all principal and interest due on the defaulted Notes.
In its defense, Northwestern does not directly claim that the waiver provisions in the surety Bonds are unenforceable. In fact, in opposition to the investors’ prior cross-motion for summary judgment, Northwestern argued that these Bonds are enforceable. However, Northwestern notes that in our Opinion of March 27, 1990, this Court decided that there were genuine issues of material fact that precluded granting to Northwestern summary judgment on the investors’ claims that the waiver provisions of the surety Bonds are *1102 void. Northwestern therefore argues in opposition to the Banks’ motion that if the investors ultimately prevail on their claims, the Banks should not be able to enforce those same waivers of defenses against Northwestern.
Although the parties briefed the issue, we did not address in our March 27 Opinion whether, assuming that the waiver of defenses in the surety Bonds are in fact void, the investors have valid defenses to payment of the Notes. It was unnecessary for this Court to reach that issue in denying Northwestern’s motion for summary judgment. We now consider those arguments and reject the various defenses asserted by the investors against the Banks. First, we note that at various times in connection with their acquisition of the Notes, the Banks asked each of the investors to execute an estoppel letter which expressly waived defenses to payment of the Notes. Northwestern has submitted to the Court letters from 48 investors to Pri-vatbanken stating:
I expressly waive, as against the Bank and any subsequent holder of the Note, any defenses, set-offs, counterclaims or other objections to the full and prompt payment of all principal of and interest on the Note that I may now have or hereafter acquire against Gas Reclamation, Inc. or any other person, firm or other entity directly or indirectly controlled by, controlling or under common control with Gas Reclamation, Inc.
See Affidavit of H. Adam Prussin dated Jan. 29, 1990; Supplemental Memorandum of Northwestern in Support of its Motion for Summary Judgment; Supplemental Affidavit of H. Adam Prussin dated February 6, 1990, Ex. 2. Northwestern also has submitted to the Court executed “Notice and Acknowledgment of Assignment” letters from 21 of the IMC investors which state:
In order to induce the Bank to accept the notes as collateral security, and with full knowledge that the Bank will rely on your representations and agreements herein, we also request that you represent, warrant and agree that the Note is your valid and binding obligation and that you will make full payment of all amount due under the Note in accordance with the terms of the Note without claiming any discount, defense, setoff or other right.
Please acknowledge the terms of this letter by signing the extra copy in the space provided below and returning the same to the Bank in the enclosed, self-addressed envelope.
(emphasis supplied). See Supplemental Affidavit of H. Adam Prussin dated Feb. 6, 1990. While other investors may have also executed such estoppel letters, for the purposes of this motion for partial summary judgment, there is no dispute that those 68[3] of the 97 investors did waive their defenses to payment of their Notes based on claims against GRI. It is well-settled that such waivers are fully-enforceable whether or not the investors were aware of any fraud defenses when they executed the waivers. See U.C.C. § 9-206(1); Bankers Trust Co. v. Litton Systems, Inc., 599 F.2d 488, 490-91 (2d Cir.1979); Jonwilco, Inc. v. C.I.T. Financial Services, 662 S.W.2d 664 (Tex.Ct.App.1983); FDIC v. Kassel, 72 A.D.2d 787, 421 N.Y.S.2d 609 (1979). Therefore, even if the surety Bonds had not contained waivers of defenses, Northwestern could not assert any defenses on behalf of the 68 investors who executed such estoppel letters.
Second, as to the other investors who may not have signed estoppel letters, we must decide whether the Notes are subject to fraud defenses based on GRI’s misconduct. The investors claim that the Notes are not negotiable instruments, that the Banks are not holders-in-due-course, and that GRI was the original holder of the Notes prior to their assignment to the Banks. We agree with the investors that the Notes are not negotiable instruments. Each Note bears interest at the lesser of a specified rate over the prime rate charged by a specified bank or the maximum interest rate prescribed by law. Each Note also contains a Texas choice of law provision. Under sections 3.104 and 3.106 of Texas’ *1103 Uniform Commercial Code, the holder of a negotiable instrument must be able to calculate the amount of any interest due without reference to any outside source. Since the calculation of interest due on the Notes requires reference to the prime rate then being charged by a specified bank, a source outside the instrument itself, the Notes are not negotiable instruments. See National Union Fire Ins. Co. v. Alexander, 728 F.Supp. 192, 200 (S.D.N.Y.1989) (applying Texas law); National Union Fire Ins. Co. v. Tegtmeier, 673 F.Supp. 1269, 1271-73 (S.D.N.Y.1987). But see First City Fed. Sav. Bank v. Bhogaonker, 715 F.Supp. 1216, 1219-20 (S.D.N.Y.1989) (giving retroactive effect to 1988 amendment to New York U.C.C. § 3-106 which expressly permits variable interest rates on negotiable instruments).
Since the Notes are not negotiable instruments, the investors argue that their claims for securities fraud against GRI can be asserted as defenses to payment against the Banks. Since we find that GRI was never an owner or holder of the Notes, we reject that claim. Each investor originally signed his Note with the name of the payee left blank and executed a “Specific Power of Attorney” that appointed GRI as his “true and lawful attorney-in-fact” “[t]o insert the name of the Bank which will be the Payee of the Note ...” and “[t]o receive the proceeds of the loan....” GRI accumulated these signed Notes and negotiated with the Banks to obtain financing. At the first seven closings of investor purchases, GRI inserted the name IMC as payee of the Notes, and at the last two closings, GRI inserted the name Privatbanken. IMC subsequently endorsed various Notes to CNB, Ensign and Morris. The recitals in most of the surety Bonds confirm this sequence of events:
WHEREAS, Principals for valuable consideration have delivered to Gas Reclamation, Inc. (“GRI”) their promissory notes payable in blank ... and have authorized Obligee to insert the name of payee therein; and
WHEREAS, (“GRI”) has caused the name of [IMC] to be inserted as payee of the Notes, and [IMC] has endorsed the Note to the Permitted Assignee ...
An instrument signed in blank is not complete and enforceable until the blanks are filled in. U.C.C. § 3-115(1). The investors’ powers of attorney did not authorize GRI to fill in its own name as payee, only the name of a bank, and GRI’s name does not appear anywhere on the face of any Note. By acting as the investors’ agent, GRI did not become an owner or holder of the Notes. To support their argument, the investors point to other terms and recitals in the surety bonds, to deposition testimony and to IMC’s commitment letter which stated that IMC would “purchase from GRI” the promissory Notes. See Gold Aff. 11 67, Gold Aff. Ex. 61, Butler Dep. Ex. 109A. However, the investors do not dispute the fact that GRI accepted the signed notes from the investors and filled in the name of a Bank as payee pursuant to its power of attorney. This Court is not bound by legal conclusions contained in other documents and made by various participants in the transactions. We therefore conclude that GRI was never a holder or owner of any Note, but only the investors’ agent for completion and delivery of those instruments. The investors cannot assert their claims against GRI for fraud as defenses against their obligations to the Banks.
The investors also argue that even if the original holders of the Notes were Privat-banken and IMC, not GRI, their defense of fraudulent inducement still exists. Specifically, the investors argue that Richard Kelly, IMC’s agent, knew of Alan Esrine’s criminal background as early as June, 1984, but that IMC did not disclose that fact to the investors. See Texas’ Investors Response to the Motion for Quia Timet and Exoneration Relief at 17 & Ex. C. The investors also argue that an internal memorandum indicates that Privatbanken had reviewed a copy of the Jordan Program Report and knew that the funds from the gas reclamation units would be pooled even though the Private Placement Memorandum given to both Privatbanken and the investors represented that the funds from each unit would remain segregated. See id. at 18 & Ex. D. The investors argue *1104 that as a result these fraudulent nondisclo-sures and misrepresentations by the original payees of the Notes, the Notes are unenforceable by CNB, Ensign and Morris, the assignees of IMC, and Privatbanken.
Under New York law, a duty to disclose arises “where the parties enjoy a fiduciary relationship” or “where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.” Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, 781 F.2d 112, 123 (2d Cir.1984) (citations omitted); see Beneficial Commercial Corp. v. Murray Glick Datsun, Inc., 601 F.Supp. 770, 773-74 (S.D.N.Y.1985); Restatement (Second) of Contracts § 161 (1981); see also Castillo v. Neeley’s TBA Dealer Supply, Inc., 776 S.W.2d 290, 295 (Tex. Ct.App.1989). Banks generally do not owe their customers any fiduciary duty, see Aaron Ferer & Sons, 731 F.2d at 122, and the parties here do not argue that they intended the relationship between the Banks and the investors to be more than a debtor-creditor relationship. There is also no evidence indicating that IMC knew that the investors were acting on the basis of any mistaken knowledge or that Esrine's criminal background caused the investors’ losses. It is also clear that Privatbanken did not possess any superior information about the contradictory statements regarding “pooling” of funds. Therefore, IMC and Privatbanken did not have any duty to disclose such information. We reject the investors’ defense of fraudulent inducement by IMC and Privatbanken.
In sum, we hold that under the terms of the Bonds, Northwestern has waived defenses to payment of the Notes. Moreover, even if the waiver of defenses provisions in the surety Bonds are void, the investors do not have any valid defenses to payment of their Notes. Therefore, Northwestern, as their surety, is obligated on their behalf to make payment to the Banks.
The Banks’ motions for partial summary judgment are granted.
II. Northwestern's Motion for Quia Timet Relief or Exoneration
Northwestern moves for “an order pursuant to this Court’s general equity power enforcing Northwestern’s equitable rights, as surety, of quia timet and exoneration by ordering each Investor, and each broker-defendant investor ... to pay all amounts due and owing under his promissory note” held by the Banks. We deny the motion.
Exoneration is the equitable right of a surety to compel its principal to pay his or her debt and thereby discharge the surety’s obligation under its bond. See Filner v. Shapiro, 633 F.2d 139, 142 (2d Cir.1980); Admiral Oriental Line v. United States, 86 F.2d 201, 204 (2d Cir.1936) (“In equity, ... before paying the debt a surety may call upon the principal to exonerate him by discharging it; he is not obligated to make inroads into his own resources when the loss must in the end fall upon the principal.”) (citations omitted); Restatement of Security § 112 (1941). Quia timet is the right of the surety to compel its principal to place the surety “in funds” sufficient to prevent anticipated future losses, where a surety has reasonable grounds to believe that its principal will not perform his obligations:
A court of equity will also prevent injury in some cases by interposing before any actual injury has been suffered by a ... bill quia timet.... Thus a surety may file a bill to compel the debtor on a bond in which he has joined to pay the debt when due, whether the surety has been actually sued for it or not....
New Orleans v. Gaines’s Administrator, 131 U.S. 191, 212, 9 S.Ct. 745, 752, 33 L.Ed. 99 (1889) (citation omitted). See Milwaukie Constr. Co. v. Glens Falls Ins. Co., 367 F.2d 964, 966 (9th Cir.1966) (quoting 50 Am.Jur. Suretyship § 225 (1944)) (“ ‘Not only does a bill quia timet lie to compel the principal to pay the debt after it has become due, but its use has also been extended to compel the principal to furnish the surety indemnity against possible loss where the surety has reasonable grounds for anticipating that his rights are being jeopardized and that he will incur a liability *1105 by threatened conduct of the principal.’ ”); American Surety Co. of New York v. Lewis State Bank, 58 F.2d 559, 560 (5th Cir.1932). These rights are well-established principles of the common law of suretyship. See e.g., Restatement of Security § 112 (1941); 63 N.Y.Jur.2d Guaranty and Suretyship § 419 (1987); 74 Am.Jur.2d Suretyship § 174 (1974). The indemnity contracts between the investors and Northwestern also expressly grant Northwestern similar rights:
If requested, [the investor will] place the Company [Northwestern] in funds immediately to meet any claim or demand before the Company shall be required to make payment.
These rights are separate and distinct from the surety’s right to indemnification, which is the right to receive from its principal reimbursement after the surety has already paid the creditor.
Northwestern here has clearly demonstrated the existence of its contractual, common law and equitable claims for quia timet and exoneration relief. As our decision above on the Banks’ motions for partial summary judgment indicates, there exists a valid debt, due and unpaid, for which Northwestern contracted to act as surety. The Banks are also clearly entitled to choose to seek payment from Northwestern as their surety rather than from the individual investors. However, we decline, for these purposes, to separate Northwestern’s claims for relief against the investors from the investors’ claims for relief against Northwestern. As to these latter claims, if the investors succeed at trial, they would have the right to preclude or offset the relief Northwestern seeks from them. These claims by the investors have survived both Northwestern’s motion to dismiss and Northwestern’s motion for summary judgment. The Federal Rules of Civil Procedure provide for joint resolution of all claims arising out of a single transaction or occurrence. We therefore consider the claims presented by the investors in connection with Northwestern’s motion for exoneration and quia timet relief.
Northwestern’s motion presents the question which parties should be required to advance funds during the pendency of this lawsuit. It is no longer possible for this Court to maintain the status quo. Our decision above to grant partial summary judgment to the Banks establishes that the investors do not have any defenses to payment of their Notes and that the Banks are entitled to be paid by Northwestern. We must now decide whether or not Northwestern is entitled to be reimbursed simultaneously by the individual investors. In advance of a trial on the merits of the various claims of Northwestern and the individual investors, we refuse to grant that relief to Northwestern. The ultimate responsibility for the debts evidenced by the Notes can only be established by such a trial. Northwestern, as surety, accepted premiums from the investors in exchange for its promise to guarantee the investors’ payments to the Banks. That contractual promise did not limit Northwestern’s commitment to pay the Banks to cases of financial insolvency of individual investors. Even if we assume that Northwestern will ultimately collect from each investor, one of the obligations Northwestern was paid to assume as surety was the risk that it would be required to advance payments for which it would eventually receive reimbursement.
Northwestern argues that our decision will cause it to lose its equitable rights to exoneration and quia timet relief. After it pays the Banks, Northwestern can only seek indemnification or reimbursement from the investors. Northwestern argues that a surety’s rights to equitable relief prior to payment should not be lost simply because the principals have asserted claims against their surety. We do not decide whether any allegations by a principal against its surety will in and of themselves defeat a motion by the surety for equitable relief prior to payment. We note that in this case the investors’ claims have survived Northwestern’s motion for summary judgment. Forced to chose between the surety and its principals, we believe that in this case equitable considerations require Northwestern to make the required pay *1106 ments to the Banks and wait until the conclusion of trial for reimbursement, if any, from the investors.
We note that three federal district courts have recently granted relief to Northwestern in cases involving similar facts. See Northwestern Nat’l Ins. Co. v. Alberts, 741 F.Supp. 424 (S.D.N.Y.1990); Wingsco Energy One v. Vanguard Groups Resources 1984, Civ. No. H-86-452, 1988 WL 142135 (S.D.Tex. Nov. 14, 1989); Northwestern Nat’l Ins. Co. v. Barney, C86-3936 (N.D.Ohio Nov. 18, 1988). All three cases involved similarly-structured bonded investor note transactions. The banks had successfully established their rights to payments from Northwestern, and Northwestern moved for a preliminary injunction to enforce its rights, as surety, to quia timet and exoneration relief against the investors. In all three cases, the investors had outstanding claims against Northwestern. The courts, applying the standards for issuance of a preliminary injunction, concluded that Northwestern was likely to succeed on the merits at trial against the investors. However, rather than ordering the investors to pay the banks directly, as Northwestern sought, the three district judges, acting pursuant to their general equitable powers, ordered the investors to pay into court as security for Northwestern the amount that Northwestern was required to pay the banks. In effect, the courts avoided choosing in advance of trial between the surety and its principals by requiring both to pay.
We believe that in this case the investors have made a more significant showing of the merits of their claims against Northwestern. This Court recently denied Northwestern’s motion for summary judgment on the investors’ claims. The Court in Alberts, on the other hand, did not consider the merits of the investors’ cross-claims against the surety, but limited its inquiry to the merits of the quia timet claims. In Wingsco, the court also did not consider the merits of the investors' claims except to state that “Northwestern might have some liability to the Plaintiffs if other facts are shown to be true.” (emphasis in original). The Barney court, on the other hand, carefully considered the investors’ claims against their surety and concluded that “[t]he shareholder-defendants have not offered any proof to augment or support the claims of their amended counterclaim and cross-claim” and that their claims were “found wanting” and were of “uncertain nature.”
The other three courts also seem to have ruled on the quia timet motions at an earlier stage in the litigation proceedings. In Alberts, the parties were still seeking leave to amend their complaint and counterclaims, and discovery had not been completed. While the Wingsco court had denied Northwestern’s motion for summary judgment before granting quia timet relief, the court in Barney evaluated the merits of the claims in connection with the quia timet motion. In all three cases, the surety had moved for a preliminary injunction. While in those cases it may have been difficult or impractical for the courts to evaluate the merits of the investors’ claims against their surety, the proceedings in this multidistrict case have advanced to a stage where such a question is capable of efficient resolution. The parties here have conducted discovery for over three years, and this Court has twice tested the merits of the investors' claims. We do not suggest that before a court can grant quia timet relief, it must permit full discovery. However, since the issues in this case have been so fully briefed and argued, we believe that it is appropriate to consider our prior evaluation of the merits of the investors’ claims in evaluating Northwestern’s entitlement to the equitable relief it seeks.
While the traditional quia timet remedy would require a principal to pay the creditor directly, Northwestern also argues here in the alternative that this Court should order the investors to pay money into court as security. Such relief clearly satisfies the Banks’ rights to receive payment and imposes equal financial burdens on the surety and its principals. However, we find no difference between that order and an order granting Northwestern the provisional relief of attachment. Since Northwestern does not argue that it could meet *1107 the well-defined requirements for attachment relief under either New York or Texas law, we refuse to circumvent those state law provisional remedies and order identical relief under this Court’s general equitable powers. But see Alberts, supra.
Northwestern’s motion for quia timet or exoneration relief is denied.

III. Cross-Motions for Reconsideration

Both Northwestern and the Abish Investors move for reconsideration of this Court’s March 27, 1990 Opinion. We grant their motions. Upon reconsideration, we adhere to our prior decision except insofar as it is inconsistent with today’s decision. Specifically, we decide today that even if the waiver of defenses provisions in the surety Bonds are void, the investors do not have any valid defenses to payment of their Notes. See supra at 16ff. Therefore, even if Northwestern did not disclose to the investors that the surety Bonds contained such waivers, that nondisclosure did not injure the investors. Northwestern therefore argues that the investors have not stated a claim for rescission of their indemnity agreements under section 29(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78cc(b) (1981). However, as our prior Opinion noted, if the indemnity agreements are treated as part of a single contract with the other documents in the PPM, then genuine disputes over material facts still exist and preclude granting Northwestern summary judgment on the investors’ section 29(b) claims. See In re Gas Reclamation, Inc. Sec. Litig., 733 F.Supp. at 719-20.
We have also considered Polycast Technology Corp. v. Uniroyal, Inc., 728 F.Supp. 926 (S.D.N.Y.1989) and adhere to our prior decision granting Northwestern summary judgment on the investors’ claims for violations of section 12 of the Securities Act of 1933, 15 U.S.C.A. § 771.

IV. Summary

The Banks’ motions for partial summary judgment are granted. Northwestern’s motion for quia timet or exoneration relief is denied. Northwestern’s and the Abish Investors’ cross-motions for reconsideration are granted. Upon reconsideration, we adhere to our prior decision, In re Gas Reclamation, Inc. Sec. Litig., 733 F.Supp. 713 (S.D.N.Y.1990), except to the extent it is inconsistent with today’s Opinion.
Pending before this Court are Northwestern’s objections to Magistrate Berni-kow’s Report and Recommendation dated April 16, 1990 with respect to Northwestern’s motion to dismiss the Banks’ punitive damages claims and Northwestern’s motion in the alternative for summary judgment on those claims. The parties are directed to submit letters to the Court by July 23, 1990 briefly explaining any other outstanding pre-trial matters. The plaintiffs are directed to notify all parties that this Court will hold a conference on September 12, 1990 at 4:30 p.m. in Courtroom 601.
SO ORDERED.

. We do not rely on the fact that the Banks and the investors have agreed to dismiss their claims against each other because Northwestern should not be prejudiced by what may have been a strategic ploy to enhance Northwestern’s liability. The investors argued in opposition to Northwestern's motion for summary judgment that they had valid defenses to payment of their Notes, and we consider those arguments in connection with this pending motion.

. There are some slight and immaterial variations in the wording of some of the Bonds. For *1101 example, Bonds which include paragraph 9A, infra, as a rider do not contain subparagraph (g).

. Investor R. Harris submitted estoppel letters to both Privatbanken and IMC.